UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DISTRICT

| | |
|---|---|
| JANE AND JOHN DOE, individually and on behalf of their minor child, A.A., JESSICA AND JAMES DOE, individually and on behalf of their minor child, B.B., and JILL AND JEFF DOE, individually and on behalf of their minor child, C.C.,<br><br>    Plaintiffs,<br><br>v.<br><br>ABERDEEN SCHOOL DISTRICT, BECKY GUFFIN, in her individual and official capacity, CAMILLE KAUL, in her individual and official capacity, RENAE RAUSCH, in her individual and official capacity, COLLEEN MURLEY, in her individual and official capacity, MICHAEL NEUBERT, in his individual and official capacity, CARRIE WIESENBURGER, in her individual and official capacity, and DOES 1 – 2,<br><br>    Defendants. | Civil File No.  1:18-cv-1025<br><br><br>**COMPLAINT**<br><br><br><br>Jury Requested |

## INTRODUCTION

The above-named plaintiffs, Jane and John Doe and A.A., a minor child, by and through her parents, Jessica and James Doe and B.B., a minor child, by and through his parents,  and Jill and Jeff Doe and C.C., a minor child, by and through his parents (collectively "plaintiffs") allege as follows:

Each of the children with disabilities identified in this complaint began preschool at Lincoln Elementary and continued through their 2nd grade.  They were happy, well-adjusted, and

thriving students with disabilities. Aberdeen Public School personnel at Lincoln Elementary were caring, supportive and well-trained education professionals. Each child loved school and learning. Each child loved swimming. They loved their teachers and their peers and enthusiastically participated in school. The children's parents were actively and successfully engaged in all aspects of their child's life, including their education.

At the onset of 3rd grade, each child was required to transfer from Lincoln Elementary to a new elementary school, May Overby Elementary. Each child began their 3rd grade as the same happy, well-adjusted and thriving students with disabilities who had succeeded at Lincoln. However, all of the success the children experienced at Lincoln drastically changed when Aberdeen Public Schools required each child to transfer to May Overby Elementary. Suddenly, each child began to express significant distress with attending school.

For a period of two years, each set of parents struggled to understand what was happening to their children at May Overby. The parents of each child, separate from other children's parents, attended monthly meetings with May Overby administration to discuss the drastic change each child was experiencing. May Overby employees blamed the children's disabilities for the changes. No one from ASD disclosed that other children were experiencing the same significant deterioration. No one from May Overby took any action to protect the children or disclosed to the children's parents that other education professionals had made complaints regarding Carrie Weisenburger physical and emotional abuse and misconduct toward children with disabilities in her classroom. No one from ASD reported the conduct to any state or supervisory agency. The parents were informed for the first time in August 2016 that other children with disabilities in the classroom suffered similar drastic changes and deterioration.

Once informed of the physical and emotional abuse, the parents immediately filed a complaint on August 26, 2016 with the United States Department of Education, Office of Civil Rights ("OCR") and the United States Department of Justice ("DOJ"). The plaintiffs were never contacted by representatives from either the OCR or DOJ to discuss the allegations, take statements, collect evidence, or discuss the resolution of the complaint. On August 9, 2018, without the knowledge or consent of the plaintiffs, the OCR entered into a Resolution Agreement with ASD requiring it to follow the law in the future. The DOJ investigation remains open but unresolved.

After two years of physical and emotional abuse and two years of fruitless investigations by the federal agencies, the plaintiffs filed the current law suit.

### JURISDICTION

1.       The plaintiffs bring this action under and pursuant to 42 U.S.C. § 1983 to secure equitable relief and damages from actions initiated by defendants under color of state law that violated the rights, privileges, and immunities guaranteed to the plaintiffs by the United States Constitution, directly under and through the Fourth and Fourteenth Amendments to the United States Constitution and Article IV, §§ 2 and 5 of the South Dakota State Constitution.

2.       The Court has original jurisdiction to entertain the cause of action enumerated in paragraphs 123 to 140 of this complaint pursuant to 28 U.S.C. §§ 1331 and 1343.

3.       The amount in dispute, as more fully set forth below, exclusive of interest and costs, exceeds the sum of $75,000.00 thus conferring jurisdiction with this Court pursuant to 28 U.S.C. § 1332.

4.       This case arose in Brown County, South Dakota and should be assigned to the Northern Division of the District Court of South Dakota.

5.      The plaintiffs also seek redress for common and state law rights under supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

**PARTIES**

6.      Jane Doe is a resident of the City of Aberdeen, County of Brown, South Dakota.  She brings this action on behalf of her daughter, A.A.

7.      John Doe is a resident of the City of Aberdeen, County of Brown, South Dakota.  He brings this action on behalf of his daughter, A.A.

8.      A.A. is a minor and a resident of the City of Aberdeen, County of Brown, South Dakota.

9.      Jessica Doe is a resident of the City of Aberdeen, County of Brown, South Dakota.  She brings this action on behalf of her son, B.B.

10.     James Doe is a resident of the City of Aberdeen, County of Brown, South Dakota.  He brings this action on behalf of his step-son, B.B.

11.     B.B. is a minor and a resident of the City of Aberdeen, County of Brown, South Dakota.

12.     Jill Doe is a resident of the City of Aberdeen, County of Brown, South Dakota.  She brings this action on behalf of her son, C.C.

13.     Jeff Doe is a resident of the City of Aberdeen, County of Brown, South Dakota.  He brings this action on behalf of his son, C.C.

14.     C.C. is a minor and a resident of the City of Aberdeen, County of Brown, South Dakota.

15.     At all times relevant herein defendant Carrie Weisenburger ("Weisenburger") was a teacher employed by Aberdeen School District ("ASD"), Aberdeen, South Dakota at May Overby Elementary School ("May Overby"). All of Weisenburger's actions or inactions set forth herein were taken under the color of state law and in the course and scope of her employment.

16.     At all times relevant herein defendant Becky Guffin ("Guffin") was the Superintendent employed by ASD. All of Guffin's actions or inactions set forth herein were taken under the color of state law and in the course and scope of her employment.

17.     At all times relevant herein, defendant Camille Kaul ("Kaul") first served as the Special Education Director and began serving as ASD's Assistant Superintendent in July 2016.  All of Kaul's actions or inactions set forth herein were taken under the color of state law and in the course and scope of her employment.

18.     Beginning in July 2016, defendant Renae Rausch ("Rausch") became the Special Education Director employed by ASD. All of Rausch's actions or inactions set forth herein were taken under the color of state law and in the course and scope of her employment.

19.     At all times relevant here, defendant Collen Murley ("Murley") was the Principal at Simmons Middle School, employed by ASD.  All of Murley's actions or inactions set forth herein were taken under the color of state law and in the course and scope of her employment.

20.     At all times relevant herein, defendant Michael Neubert ("Neubert") was the Principal at May Overby, employed by ASD.  All of Neubert's actions or inactions set forth herein were taken under the color of state law and in the course and scope of his employment.

21.     At all times relevant herein, defendant Carrie Wiesenburger ("Wiesenburger") was a teacher at May Overby, employed by ASD.  All of Wiesenbuger's actions or inactions set forth herein were taken under the color of state law and in the course and scope of her employment.

22.     At all times relevant herein, defendant Does 1 and 2 were the aides employed by ASD and in defendant Weisenburger's classroom.  All actions alleged herein by defendant Does were taken under the color of state law and in the course and scope of their employment.

23.     The Aberdeen School District ("ASD") is a public entity duly incorporated and operating under South Dakota law as a public-school district.  Defendant ASD is a public entity subject to the requirements of Title II of the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, South Dakota state law requiring full and equal access to public facilities pursuant to South Dakota Human Rights Act, SDCL 20-13-01 *et seq*. and all other legal duties and obligations set forth in this Complaint.

24.     In enacting Title II of the Americans with Disabilities Act, Congress validly abrogated state sovereign immunity and thus ASD may be sued pursuant to Title II.  42. U.S.C.  § 2000d-7(a)(2); *Jim C. United States*, 235 F.3d 1079, 1080 (8th Cir. 2000). By accepting Federal Rehabilitation Act funds, ASD waived its sovereign immunity under the Eleventh Amendment to claims brought pursuant to § 504 of the Rehabilitation Act of 1973. *Doe v. Nebraska*, 345 F.3d 593, 598 (8th Cir. 2003).

25.     Title VI of the Civil Rights Act provides that "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of ... any other Federal statute prohibiting discrimination by recipients of Federal financial assistance. 42 U.S.C. § 2000d–7(a)(1).

26.     The true names and capacities of defendants sued Does 1 and 2 (education aides) are unknown to plaintiffs and plaintiffs pray leave to amend to allege the true names and capacities when they can be ascertained.

27.     At all times relevant herein, all defendants acted or failed to act in concert and as the agent of one another.  Defendants' conduct, herein described, was contrary to proscribed professional conduct clearly set forth, *inter alia*, in federal and state statutes, rules and regulations, policy and procedures, licensing requirements, and professional standards.

**ALLEGATIONS RELATING TO PLAINTIFF A.A.**

28.     A.A. is a thirteen-year old attending her seventh-grade school year.  She is presently attending a private school.  Jane and John Doe are her parents and removed A.A. to a private school on October 23, 2017 to protect her from further damage to her education, safety, and well-being.

29.     Prior to A.A.'s removal to May Overby for her third grade, her education began in pre-school at Lincoln Elementary.  She was a bright and cheerful child who had been an eager and engaged learner.  She was very social, loved going to school, and loved interacting with her peers and teachers.  Her favorite activities at school were inclusion with her peers, music, recess, and swimming.

30.     A.A. has been diagnosed with autism spectrum disorder and moderate cognitive disability.  A.A. is verbal but unable to directly communicate her experiences in the public school.

31.     On or about August 19, 2014, at the beginning of her third grade, A.A. was required to move from her resident school, Lincoln Elementary ("Lincoln"), to May Overby Elementary ("May Overby ").  ASD staff told the parents that there was no other elementary school where A.A.'s special education and related services were provided.  As a result, A.A. was assigned by ASD to defendant Weisenburger's special education classroom.  At the time, A.A. was a nine-year old who stood no more than 4 feet, 4 inches and weighed no more than 62 pounds.

32.     At the beginning of A.A.'s third grade 2014/15 school year, her parents saw a drastic change in her behavior and attitude toward school.  A.A. previously loved going to school.  She enjoyed learning and was very socially engaged with her teachers and classmates.  A.A. was a bright, sweet little girl who flourished and thrived at Lincoln Elementary.   In late August 2014, she began to cry before school, insisting she did not want to go.  She also resisted going swimming at school, though she loved swimming.   A.A.'s resistance to school became a daily experience

with increasingly worrisome behavior.   At a loss, Jane Doe immediately reached out to May Overby staff in an effort to communicate the sudden change.  On September 3, 2014, Jane Doe went to the YMCA pool to observe A.A. during her swim class.  Jane Doe observed Weisenburger yank a disabled child forcefully by the arm to direct the child.  During a subsequent observation, Jane Doe saw an education aide, in an aggressive and confrontational manner, put her anger filled-face very close to A.A.'s.  A.A. cowered from the aide.

33.     Immediately after observing the second incident, Jane and John Doe contacted ASD's Special Education Director, defendant Kaul to set up a meeting. Defendant Kaul met with Jane and John Doe on September 18, 2014.  Jane Doe described for Kaul her observations and A.A.'s drastic and strong resistance to school and swimming.  A.A.'s parents asked Kaul to return A.A. to Lincoln where she thrived.  Defendant Kaul dismissed their concerns and denied the request.

34.     After the meeting with defendant Kaul, Jane and John Doe engaged in an effort to advocate for A.A., to report A.A.'s deteriorating behavior in emails, telephone calls and meetings with defendants Guffin, Kaul and Neubert.  Defendants dismissed Jane and John Doe's observations and concerns. Jane and John Doe attended at least 10 times from the 2014/15 and 2015/16 school year to report the changes in A.A.'s behavior, ask for assistance, and advocate for A.A.'s education.  No ASD employee took any steps to determine the source of the drastic behavior change nor took any steps to stop Weisenburger and education aides' abuse of A.A.  Neither Guffin, Kaul, nor Neubert informed A.A.'s parents that Weisenburger had been placed on an assistance plan or that multiple individuals had filed complaints related to Weisenburger's and the aides' conduct with disabled children.  As A.A.'s behavior and functioning changed, she began to elope from the classroom and May Overby.  After two significant eloping events during which A.A. was able to leave school grounds, Jane and John Doe offered to bring in outside professionals

to assist.  In one instance, A.A. was allowed to get within one block away from school staff, on a busy street.  In another, she was nearly struck by a garbage truck on the street.  ASD employees declined the assistance offered by A.A.'s parents.  Defendant Neubert denied that there was a serious safety issue.

35.    Jane and John Doe were not told that A.A. was being physically and emotionally abused in Weisenburger's classroom.  No employee from ASD informed A.A.'s parents that other parents of special needs children were reporting similar significant changes to their children's behavior to ASD or that ASD staff were reporting Weisenburger and the aides' abuse of the children to defendant Kaul.  On information and belief, Kaul informed defendants Guffin and Neubert.  At no time were Jane or John Doe told that A.A. was being routinely and persistently confined in a closet for disciplinary purposes.  It was not until the end of A.A.'s fourth grade year, in a March 2016 meeting, that defendant Weisenburger told Jane and John Doe that an "unhappy face" on her daily logs reflected A.A.'s removal to the closet.  Weisenburger used the phrase "Little Room" as a euphemism for a closet located behind a stage in the auditorium at May Overby.  The "unhappy face" on her daily logs reflected that A.A. was confined to the closet without food, water, or a restroom break 274 times between October 26, 2015 – March 1, 2016.  Jane and John Doe were never shown the closet at anytime during its use with A.A.

36.    Defendants Weisenburger, Guffin, Kaul, and Neubert deliberately, repeatedly, and persistently misled Jane and John Doe by stating that A.A. was going to the "Little Room" to complete assignments.  Instead, A.A. was being pushed, shoved and dragged into what had previously been used as a closet.  The closet was without a window or egress, and was forcibly held shut from the outside by either Weisenburger or an education aide.  During the time that A.A.

was confined in the closet, she was denied access to the restroom, lunch, water, and any education or inclusion activities.

37.    In early August 2016, Jane and John Doe were informed for the first time that Weisenburger and the education aides had been reported to be physically and emotionally abusing A.A., as well as all the other minor children with disabilities in Weisenburger's classroom.  The abuse was reported to Jane and John Doe by an education professional.   The education professionals also confirmed that reports had been made during the past two school years and that Weisenburger had been put on a remediation plan while teaching A.A.  Upon receiving this information, Jane and John Doe immediately procured legal assistance and filed a complaint with the Office of Civil Rights and United States Department of Justice on August 31, 2016.

38.    Jane and John Doe asked the Enrich Program in which A.A. was attending be provided at Lincoln Elementary for the 2016/17 school year.  Defendants Guffin, Kaul, and Rausch denied the request.  Instead, A.A. was assigned to May Overby.

39.    Despite the significant allegations of physical and emotional abuse, defendants Guffin, Kaul, Rausch, and Neubert permitted Weisenburger to return as a teacher for special needs students at May Overby in the fall of 2016.  Weisenburger was given a special education resource room in the same building as the minor plaintiffs' fifth grade special education classroom. Weisenburger continued to have access to both the students and parents of the students.

40.    At all times relevant herein, A.A. was to have inclusion time with her non-disabled peers including instruction in the mainstream classroom as well as music, computer, gym, lunch, and recess.  Weisenburger required the students in her classroom, including A.A., to sit in the back of the room at a large, single table in the mainstream classroom.  A.A.'s non-disabled peers sat at individual desks.  There was no set schedule for the disabled children to attend their mainstream

classes and Weisenburger and aides hustled the disabled children in and out of the classroom as if A.A.'s attendance was a significant disruption to her non-disabled peers.  Weisenburger and aides restricted the disabled children's contact with non-disabled peers during mainstream classroom.

41.     At all times relevant herein A.A. and her special needs classmates were not permitted to join their non-disabled peers in lunch or recess.  Weisenburger required all of the disabled children in her classroom to eat at a separate, designated table and to participate in a recess space at a time different from their non-disabled peers' recess.

42.     Weisenburger was overheard to state in her classroom and within the school community that there was no point in teaching the children with disabilities in her classroom as "they did not even know their A-B-Cs" and that the students were "monsters".  This was reported to ASD administration.

43.     Jane and John Doe were so concerned about A.A.'s continued education in ASD, and disturbed by the significant distress that A.A. was manifesting and lack of response by ASD as well as the retaliatory actions by ASD personnel, they felt forced to remove A.A. from ASD to a private school to ensure her safety and well-being.

44.     Prior to leaving ASD, A.A.'s parents advocated for education staff training and supervision related to the special education services, modifications and accommodations, and the discipline of children with disabilities.  Defendant Rausch, in a meeting on April 12, 2017, agreed to obtain the additional training over the summer of 2017 to address the parents' concerns.  However, defendant Rausch did not follow through on the agreement.

45.     After A.A.'s parents advocated for her through a complaint with the United States Department of Education, Office of Civil Rights and United States Department of Juctice, A.A. experienced retaliation at Simmons when she began her sixth-grade school year.  A.A., as a result

of her disability, required hand-over-hand assistance from ASD employees to complete daily, functional skills.  Defendants ASD, Guffin, Kaul, and Rausch created a "no touch" policy for all education with A.A., over the objections of the parents.  Thus, A.A. was permitted to leave or elope from the classroom on a regular basis.  ASD employees refused to intervene with A.A. Instead, ASD asserted that if A.A. eloped from school, they would try to block traffic and call the police.

46.     A.A. began to have wetting accidents at school despite being toilet trained for many years. After two occasions in early October 2017 in which A.A. was left to sit in Simmons front entry way in soiled clothing for approximately 5 hours, the parents requested an immediate meeting with Simmons employees.  During a meeting on October 13, 2017, defendants Murley and Rausch were made aware of the incidents but informed plaintiffs of the ASD administration's "no touch" policy, which Murley identified as a "school safety protocol" with A.A.  Defendants Murley and Rausch asserted that under no circumstances would A.A. be given any physical prompts by ASD employees.  Defendants Murley and Rausch confirmed that if A.A. fled the classroom or building, went to sit in an entry way, or left the restroom half-clothed, ASD employees would not intervene but would instead call the police.  No other student of similar age and ability was denied the interventions of education professionals to address education-related needs.

47.     In response to the toileting incidents, A.A.'s parents timely requested the video of the entry way for both incidents.  ASD responded with a limited clip of video, asserting the remainder had been videotaped over.  Because ASD employees told A.A.'s parents that they saw nothing wrong with leaving a child who had had multiple toileting accidents in a front entry way in wet clothing for approximately 5 hours and that A.A.'s elopement from school property was not a safety issue

for which precautions should be taken, A.A.'s parents determined that A.A. was no longer safe at Simmons.[1]

48.      The training and supervision Jane and John Doe were advocating for in August 2017 was the same training and supervision agreed upon between ASD and United States Department of Education, Office of Civil Rights ("OCR") in the Resolution Agreement signed by defendant Guffin on May 31, 2018. *Supra*, ¶ 122.

**ALLEGATIONS RELATING TO PLAINTIFF B.B.**

49.      B.B. is a thirteen-year old going in the seventh grade.  He is attending Simmons Middle School.

50.      B.B. was a happy-go-lucky boy when he started May Overby.  He was bright and engaging and loved school, his teachers and his peers.  He loved swimming and competed in the sport with Special Olympics.  He thrived while attending Lincoln Elementary and was making gains in each of his academic and education goals.  He was an active and enthusiastic participatant in family and community outings.

51.      When he was 2 and a half, B.B. was diagnosed with autism, attention deficit hyperactivity disorder, and chronic anxiety. He began attending the birth – 3 pre-school at Lincoln Elementary. He is a non-verbal child and cannot directly communicate his experiences during the school day.

52. On or about August 14, 2014, B.B. was required to move from his resident school, Lincoln Elementary, to May Overby Elementary.  ASD informed his parents that the transfer was necessary because special education and related services for B.B.'s education were not available for the third grade and above at Lincoln Elementary.  As a result, B.B. was removed from Lincoln Elementary by ASD and required to attend Carrie Weisenburger's special education classroom at May Overby

---

[1]  Jane and John Doe timely requested video of the incidents in which A.A. was left in the entry way in wet clothing.  ASD provided Jane and John Doe with only 30 minutes of one incident that lasted five hours.

Elementary.  At the time B.B. was removed for his third grade, he was an eight-year old who stood only 4 feet, 5 inches and weighed 81 lbs.

53.    Shortly after B.B. began attending May Overby, his behavior and level of distress underwent a drastic change.  B.B., like A.A., began exhibiting fear and distress at going to school and swimming.  He had begun crying before each school day and refusing to participate in swimming with his family or in the community.

54.    Jessica and James Doe were alarmed at the change and immediately reported to defendant Weisenburger.  By January 1, 2015, defendant Neubert joined the monthly meetings Jessica and James Doe were having with Weisenburger.  B.B.'s parents requested monthly meetings to discuss the drastic change in B.B.'s behavior toward school and swimming.  During the monthly meetings, Jessica and James Doe would inform ASD employees of their concerns.  When Jessica and James Doe were informed that Weisenburger had been placed on a remediation plan, defendant Neubert admitted that he had only visited the classroom twice.  No employee of ASD took any steps to determine the source of the drastic behavior change nor took any steps to stop Weisenburger and education aides' abuse of B.B.

55.    Jessica and James Doe were not told that B.B. was being physically and emotionally abused in Weisenburger's classroom.  No employee from ASD informed B.B.'s parents that other parents of special needs children were reporting similar significant changes to their children's behavior to ASD or that ASD staff were reporting Weisenburger and the aides' abuse of the children to defendant Kaul.

56.    A visiting parent witnessed and reported to ASD employees that Weisenburger and education aides had repeatedly and persistently pried B.B.'s fingers from the side of the pool and pushed him into the middle of the pool as he frantically tried to grasp the pool's edge for purchase.

B.B. did not have a flotation vest on and was visibly panicky and upset.  ASD employees did not inform Jessica and James Doe of the incident.  Instead, a parent informed Jessica and James Doe.

57.     B.B. was routinely dragged, shoved, pushed, pulled, and carried crying out of the classroom by Weisenburger and her aides down the hallway because he did not want to participate in gym class.   B.B. was also barricaded up against the wall in the anteroom with a partition by Weisenburger and the education aides as a means of discipline.

58.     B.B. was to have inclusion time with his peers including instruction in the mainstream classroom, and lunch and recess with his non-disabled peers.  Defendant Weisenburger required the students with disabilities in her classroom, including B.B., to sit at the back of the room at a single, large table.  B.B.'s non-disabled peers sat at individual desks.  Weisenburger and aides hustled the disabled children in and out of the classroom as if B.B.'s attendance was a significant disruption to his non-disabled peers.

59.     In March 2016, Jessica and James Doe were informed by a parent for the first time that B.B. was being physically and emotionally abused by ASD employees.  Jessica Doe immediately reported the incidents to defendant Kaul but Kaul did not respond to the report. Jessica and James Doe asked defendant Neubert to ensure B.B. did not have further contact with Weisenburger. Defendant Neubert refused.

60.     Wiesenburger and other ASD employees did not permit the students with disabilities from Wiesenburger's classroom to participate in any classroom exercises.  Nor were the students with disabilities ever given any instruction materials being presented in the mainstream classroom.

61.     At all times relevant herein B.B. and his special needs classmates were not permitted to join their non-disabled peers in lunch or recess.  Weisenbureger required all of the children with

disabilities in her classroom to eat at a separate, designated table and to participate in a recess space separated from their peers.

62.     Weisenburger was overheard to state in her classroom and the school community that there was no point in teaching the children with disabilities in her classroom as they did not know their A-B-Cs and that the children were "monsters". This was reported to ASD administration.

**ALLEGATIONS RELATING TO PLAINTIFF C.C.**

63.     C.C. is a thirteen-year old who attending the seventh grade at Simmons Middle School.

64.     C.C. was diagnosed with mild to moderate inner ear hearing loss at sixteen months of age. C.C. is non-verbal and does not possess the language skills sufficient to report his experiences within the public school.   C.C. uses hearing aids and American Sign Language to communicate. C.C.'s hearing loss was originally designated as mild-to-moderate but over time his hearing loss has advanced to moderate-to-severe.

65.     On or about August 14, 2014, at the beginning of his third grade, C.C. was removed from his resident school, Lincoln Elementary, and placed into May Overby Elementary.   ASD staff told the parents that there was no other elementary school where C.C.'s special education and related services were provided.   As a result, C.C. was assigned by ASD to Carrie Weisenburger's special education classroom.   At the time, C.C. was a nine-year old boy who stood only four feet, two inches and weighed only 59 lbs.

66.     C.C. has historically been a very exuberant swimmer.   He loved going to school, loved his peers, and being in the classroom.   After he was transferred to Weisenburger's classroom, there was a drastic change in C.C.'s response to school.   The most drastic and concerning change was that he ceased participating in swimming with his family, in the community, with Special

Olympics, or at school.  C.C. immediately began resisting going to school each morning crying, screaming, and yelling.   He became extremely anxious and hypervigilant with his surroundings.

67.     Jill and Jeff Doe reported the alarming changes in C.C.'s behavior initially with defendant Wiesenburger.  When nothing changed with C.C.'s response to school, Jill and Jeff Doe called and met with defendants Guffin, Kaul, and Neubert on a monthly basis beginning in the spring of 2014/15 school year to report their concerns and the changes in C.C..'s behavior.  None of ASD employees took any steps to determine the source of the drastic behavior changes nor took any steps to stop Weisenburger and education aides from the emotional and physical abuse reported to defendant ASD's employees.

68.     Defendants Guffin, Kaul, and Neubert refused to inform C.C.'s parents that Weisenburger had been placed on an assistance plan in part because of Weisenburger's and the aides' emotional and physical abuse that had been reported by multiple individuals.

69.     C.C.'s parents later learned, at the time the OCR complaint was filed, that an individual in the community witnessed Weisenburger and education aides forcibly strip C.C. and force him into his bathing suit.  C.C. was crying and screaming during this episode.  It was further reported that when C.C. refused to get into the pool, an education aide came up behind C.C. and forcibly shoved him into the pool.

70.     While previously attending Lincoln Elementary, C.C. flourished, and was making significant advances in his Edmark Reading curriculum.  Jill and Jeff Doe had worked with C.C. at home to support his reading and were familiar with the Edmark materials.  During the time that C.C.'s parents were investigating the reason for the drastic change in C.C., Jill and Jeff Doe asked to see C.C.'s progress in Edmark but discovered that the instructional materials had not been

opened by Weisenburger or any of the education aides.  Weisenburger and the education aides refused to provide C.C. with his Edmark instruction.

71.     Jill and Jeff Doe were not told that C.C. was being physically and emotionally abused in Weisenburger's classroom.  No employee from ASD informed C.C.'s parents that other parents of children with disabilities were reporting similar significant changes to their children's behavior.  ASD administration never told C.C.'s parents of Weisenburger's and the aides' abuse of the children with disabilities.

72.     C.C.'s parents subsequently learned that Weisenburger and education aides were forcing C.C. into a small anteroom to the classroom by forcefully holding him against the wall with large mats.  Weisenburger and aides were using their weight to force C.C. up against the wall with the mats if he attempted to leave the anteroom area.  The mats were used for disciplinary purposes.  Weisenburger and aides would leave C.C in the anteroom for long periods of time with the mats blocking his access to the classroom.

73.     C.C. was to have inclusion time with his peers including instruction in the mainstream classroom, and lunch and recess with his non-disabled peers.  Defendant Weisenburger required the students with disabilities in her classroom, including C.C., to sit in the back of the room at a single, large table.  C.C.'s non-disabled peers sat at individual desks.  Weisenberg hustled the disabled children in and out of the classroom as if C.C.'s attendance was a significant disruption to his non-disabled peers.  C.C. was also denied access to the instruction materials in the mainstream classroom.

### ALLEGATIONS COMMON TO ALL PLAINTIFFS

74.     All minor children referenced herein attended May Overby Elementary School in Aberdeen, South Dakota during the 2014 through 2017 school years.

18

74.    All minor plaintiffs were resident students of ASD at all times material herein.

75.    All minor plaintiffs were required to attend May Overby Elementary in order to receive special education and related services.  Other ASD elementary schools did not provide special education and related services past the second grade.

76.    All minor plaintiffs attended the third (2014/15 school year) and fourth grades (2015/16 school year) at May Overby with defendant Carrie Weisenburger as their teacher.  Weisenburger also had education aides (Does 1 and 2) in her classroom over whom she had supervision and management.

77.    At the time the minor plaintiffs attended Lincoln Elementary, each loved their school, teachers, and peers.  The minor plaintiffs thrived and were embraced as part of the school community at Lincoln.  The minor plaintiffs were seldom disciplined at Lincoln as there was rarely any need.  The teachers treated each child's uniqueness as the starting point for their education and the minor plaintiffs were flourishing.

78.    At the time the minor plaintiffs entered May Overby there was no history of resisting going to school or problematic behaviors either at school, the community, or home.  None of the minor plaintiffs ever posed a danger to anyone or had a history of being disruptive at school.  Over the course of their third and fourth grade school years, each child suffered deteriorating skills and new, problematic behaviors.  The deteriorating skills and behaviors began to manifest in each child's home and community environments.

79.    Defendant Weisenburger and aides were not properly trained or supervised in ASD's disciplinary, maltreatment, restraint and seclusion, and use of force policies and procedures.

80.    All minor plaintiffs witnessed Weisenburger and education aides forcing milk down another disabled student's, Student D's, throat when he did not want to drink more milk.

Weisenburger and education aides forcibly tilted Student D's head back and poured milk into his mouth until he was gagging and spitting up milk.    The minor plaintiffs also witnessed Weisenburger and education aides place Student D, who was non-verbal, epileptic, and wheelchair bound, into the hallway for long periods of time without adult supervision.   The purpose of removing him was to discipline the child for vocalizing during class time.

81.   All of the minor children witnessed another student (Student E) being routinely tied to her desk when she would become restless.   Weisenburger and the education aides used a rubberized purple exercise band to tie her to her chair.   Student E would scream, and cry while she was tied. Weisenburger and education aides would threaten and terrorize Student E and the other children in the classroom by asking if the children "wanted (the staff) to get 'purple' out?"   After individuals reported the use of "purple" to ASD administration, purple ceased being used.   Weisenburger and the education aides, as an alternative to the use of purple, obtained a desk for Student E and would use their body weight to pin Student E into her seat.   Student E would struggle, cry and scream and had welts and bruising from being tied or pinned into her seat.   Despite the reports to ASD, the practice of pinning her into the desk continued until the conclusion of the 2015-16 school year.

82.   Weisenburger would routinely grab Student E and pull her pants away from her body to look at her underwear, stating that Student E was dirty, and wearing the same underwear for a week.   Weisenburger would do this in front of the other children with disabilities in the classroom. Weisenburger also made denigrating remarks about the students' parents in front of the students and other staff.   She routinely called the father of plaintiff C.C. a "retard".

83.   In the afternoons, Weisenburger and education aides provided no instruction to the children.   Instead, Weisenburger and education aides would pick YouTube videos for the children

to watch and then shut off the classroom lights so the children could "nap." Weisenburger would leave the classroom for long periods of time on a near daily basis as well, leaving aides in charge.

84.     Multiple adults at ASD reported the abuse to their superiors, including defendants Kaul and Neubert.  Some supervising ASD employees expressed fear for their employment and retaliation for reporting the abuse.  Unknown to the parents of children in her classroom, Weisenburger was put on a remediation plan. Defendant Neubert was responsible for supervising her.  On information and belief, the remediation plan was the result of adult reports of abuse to ASD supervising employees, including defendants Kaul and Neubert.  Defendant Neubert, according to the remediation plan, was to supervise and routinely observe Weisenburger in the classroom.  Defendant Neubert did not visit the classroom as part of his supervisory responsibilities over defendant Weisenburger during the time the remediation plan was in place.  Defendant Kaul would call Weisenburger to arrange a time to observe the classroom.  Anticipating defendant Kaul's observation, defendant Weisenburger would ensure the students were in the classroom and involved in an activity during the observation.

85.     The minor children were present for and heard the denigrating remarks made by Weisenburger and education aides as set forth herein.  They witnessed Weisenburger and education aides verbally and physically abusing other special needs school mates by tying one student to a desk and terrorizing the child and other children with the threat of "purple"; forcibly keeping the same child at a desk; pushing a child into a swimming pool; other children being grabbed, shoved and dragged out of the classroom, other children being forcibly held in a small hallway with large mats pressed against him; forcibly making a child strip and dress into a bathing suit; pushing a child into the center of a pool and prying his fingers off the side when he frantically sought purchase; yanking, pulling, pushing, grabbing and carrying crying and fearful classmates;

21

making denigrating remarks in front of and about special needs classmates, and making denigrating remarks about her students to parents and the community.

86.    At all times relevant herein, the minor plaintiffs within defendant Weisenburger's special education classroom were segregated from their non-disabled peers. Weisenburger and education aides required the minor, disabled children to eat lunch at a separate, designated table and attend recess in areas routinely separate from their non-disabled peers.

87.    At all times material herein, the minor children within Weisenburger's special education classroom were denied access to their mainstream peers and instruction as Weisenburger and education aides required the disabled children to sit at a separate table in the back of the room. The non-disabled peers were placed at individual desks within the classroom. All of the children with disabilities were hustled in and out of the mainstream classroom by Wiesenburger and education aides as if their attendance would disrupt their non-disabled peers.  All of the children with disabilities were denied access to the instruction materials within the mainstream classroom.

88.    At all times relevant herein, the minor children within Weisenburger's special education classroom were subjected to excessive and undocumented physical force and confinement through the use of a locked closet in the May Overby auditorium. The practice of forcibly confining children with disabilities took place over the course of the two school years Weisenburger was in the classroom.  Each child with a disability, who was the subject of this force and confinement, was non-verbal and had limited verbal and reporting ability.  Each child with a disability was forcibly dragged, shoved, pulled or carried and confined in a closet.  Each child with a disability was forcibly locked into the closet and denied water, lunch, and restroom breaks for the duration of their confinement.  Confinement of the child with the disability could last several hours during the school day.

89.     On information and belief, non-disabled children within ASD were not punished, *inter alia*, by being physically and forcibly confined in a closet and denied access to the restroom, water or lunch; subject to denigrating remarks; subject to physical force with changing their clothing or participating in extracurricular activities; strapped and held into place; subject to witnessing verbal and physical abuse of their peers with disabilities; or isolated from peers.

90.     Defendant ASD's policies and procedures do not identify the use of a locked closet or force for the purpose of student discipline.

91.     Defendant Weisenburger and education aides treated students with disabilities more harshly than non-disabled students. Defendant Weisenburger and education aides directed excessive punishment toward children with disabilities and directed denigrating remarks about and to disabled students within her classroom.  If one of the children in her classroom misbehaved, all of the children were denied any inclusion activities within May Overby.

92.     Defendant Weisenburger refused to provide the children with disabilities school work, repeatedly remarking that there was no point in teaching the children with disabilities in her classroom.  Education aides spoke openly and in front of the children in Weisenburger's classroom about how "gross" or "disgusting" Student D was because he was not toilet trained.  In one instance, the education aides were openly discussing the size of Student D's penis and how it had "gotten bigger" over the Christmas 2015 holiday break.

93.     More than one education professional at May Overby, as well as other members in the community, reported instances of physical and verbal abuse by Weisenburger and the education aides.  Weisenburger was repeatedly reported for calling the children with disabilities in her classroom "monsters" and asserting to anyone listening that there was no point in teaching the students with disabilities because they did not know their "A-B-Cs".  These statements were

overheard by several people, including parents of the children to whom Weisenburger was referring.

94.    At all times referenced herein, the minor students within Weisenbeurger's classroom were taken to the Aberdeen YMCA for swimming.  The purpose of the swimming class was to provide the students with the physical education component of their education.

95.    All of the disabled children who attended the fourth grade for the 2015/16 school year after leaving Weisenburger's classroom were placed by the defendants into a special education classroom that was directly across from Weisenburger's assigned resource room.  Weisenburger would routinely stop into the minor plaintiffs' fourth grade special education classroom, causing additional trauma to A.A., B.B., and C.C.

96.    Jane and John Doe, Jessica and James Doe, and Jill and Jeff Doe always attended any and all meetings with ASD staff during the 2014-15 and 2015-16 school years.  By the 2015-16 school year, the named parents were being required to attend regular, and in come case monthly, meetings scheduled or rescheduled by ASD staff.  Despite the persistent meetings, ASD refused to provide any information to the parents regarding the physical and emotional abuse taking place in Weisenburger's classroom.

97.    In August 2016, Jane and John Doe, Jessica and James Doe and Jill and Jeff Doe were informed for the first time that Weisenburger and the education aides had been repeatedly reported for being physically and emotionally abusive to children with disabilities in Weisenburger's classroom.  Despite the significant allegations of physical and emotional abuse, defendants Guffin, Kaul, Rausch, and Neubert permitted Weisenburger to return as a teacher for students with disabilities in the fall of 2016.  Weisenburger's classroom was in the same building as the classroom the minor plaintiffs were placed into and the children continued to have contact with

Weisenbuger.  The continued contact with Weisenburger, over the objection of the parents, induced fear and terror in A.A., B.B. and C.C.

98.     During the 2014/15 and 2015/16 school years, ASD staff members, community members, and related service providers all reported Weisenburger's conduct, and the conduct of her aides, to ASD employees including but not limited to Guffin, Kaul, Neubert, and Rausch.

99.     Defendants Guffin, Kaul and Neubert and other unknown district and school officials were aware of defendant Weisenburger's conduct and propensity to physically and emotionally abuse students with disabilities, to treat and punish students with disabilities more harshly, and the use of denigrated remarks about and to the children with disabilities in her classroom. They were deliberately indifferent to risk that plaintiffs and other students with disabilities would be the object of discrimination and harassment in Weisenburger's classroom.

100.    Defendants Guffin, Kaul, Neubert, and other unknown district and school officials received reports from several sources that Weisenburger was physically and verbally abusing children with disabilities in her classroom.  Defendants failed to act on the reports that they received and attempted to prevent parents from reporting suspicions of child abuse to police or any other monitoring agencies. As such, they were deliberately indifferent to the likelihood that students with disabilities in Weisenburger's classroom would be subjected to violations of their constitutional rights.

101.    All of the children in Weisenburger's class during the 2014/15 and 2015/16 school years were subjected to a hostile educational environment based on their disability. They were subjected to - and observed other children with disabilities being subjected to – demeaning and insulting language, hostile and aggressive interactions with teacher and aides, and physical abuse including but not limited to pushing, shoving, dragging, and physically restraining and confining children.

The physical abuse was severe enough to cause bruising and welts on the children.  The verbal and physical abuse caused the children intense fear and other psychological damage which continued to the present.  The verbal and physical abuse interfered with their education and undermined the purpose of public education.  When each of the minor plaintiffs began school to attend their 5th grade year at May Overby, their classroom room was located down the hallway from the resource room in which Weisenburger remained employed by ASD.  As a result, the minor plaintiffs were further put in fear of their well-being by Weisenburger's access and proximity to them. In addition, Weisenburger had begun approaching the minor plaintiffs' parents demanding to know if they filed a complaint against her.

102.    Defendants Guffin, Kaul, Neubert, and other unknown district and school officials were aware of the incidents and of the potential for continuing harm to the children in Weisenburger's classroom but failed to promptly inform the parents of the children. As a result, plaintiffs Jane and John Doe, Jessica and James Doe, and Jill and Jeff Doe were deprived of the ability to comfort their children or to provide appropriate counseling, medical and/or psychological care. The failure to advise the parents promptly gave rise to the severe emotional distress in that they suffered a loss of trust in school officials and felt betrayed that they did not learn what their children had experienced at the time of the injuries when they could have responded immediately with appropriate parental support and care.

103.    On information and belief, Weisenburger was permitted to resign her position at ASD without discipline and is presently teaching equally vulnerable children in another South Dakota public school.

104.   At all times material herein, the children within Weisenberger's classroom were developmentally and physically disabled students on the premises of and under the supervision and exclusive control of defendant ASD.

105.   As a direct result of the physical and emotional abuse, each of the minor plaintiffs have been psychologically and developmentally damaged such that they had to seek private therapy to address the damage.

106.   Defendant ASD and its employees, agents, independent contractors, volunteers and aides, once they undertook to provide education to and supervision of the minor plaintiffs, owed clearly identified duties of care which included the provision of a school environment free from physical and emotional abuse.

107.   At all times relevant herein, defendant ASD and its employees, agents, independent contractors, volunteers and aides had a special relationship with the minor plaintiffs, as developmentally and physically disabled special needs students, and were aware of their unique vulnerabilities, limitations and disabilities, and owed each child all of the duties and responsibilities commensurate with the law and that special relationship.

108.   At all times relevant herein, defendant ASD and its employees, agents, independent contractors, volunteers and aides, and other individuals under its control and supervision, breached its duties and responsibilities commensurate with ASD's special relationship with the minor plaintiffs, ASD's own policies and procedures and by failing, among other actions, to utilize ordinary care.

109.   Violations of mandatory duties imposed by law and referenced under South Dakota Codified Laws Secs. 20-13-22; 27B-8-42; 20-9-6; 13-32-224-05-28; S.D. Admin. R. Secs. and other statutes, code, ordinances and enactments, including but not limited to, the South Dakota

Constitution, South Dakota Government and Education codes and the South Dakota Code of Regulations, furnish the basis for the conduct alleged and the relief being sought.

110.    At all times relevant herein, defendants ASD, Guffin, Kaul, Neubert, Rausch and its employees, agents, independent contractors, volunteers and aides, and Does 1 and 2, had specific, mandatory rules, regulations, policies and procedures that reasonable, qualified employees must know.   The specific duties were identified in ASD's policies governing the actions of all defendants.   ASD has numerous policies and procedures, including but not limited to: equal opportunity, anti-discrimination, anti-violence, student supervision, mandatory reporting of neglect or abuse, due process, codes of conduct, and school personnel complaints.  In furtherance of specific policies and procedures, ASD provides forms to ensure compliance.

111.    As a further proximate result of defendants' actions as alleged herein, minor plaintiffs A.A., B.B., and C.C. have suffered physical injuries and pain and emotional distress and suffering. Plaintiffs Jane and John Doe, Jessica and James Doe, and Jill and Jeff Doe have suffered emotional distress and suffering.

112.    As a further proximate result of defendants' actions as alleged herein, plaintiffs Jane and John Doe, Jessica and James Doe, and Jill and Jeff Doe have incurred and will continue to incur expenses including medical and therapeutic services for the minor children.

113.    Defendants Weisenburger, Guffin, Kaul, Neubert, and Rausch's conduct was willful, malicious, purposely, intentionally or in reckless disregard of the minor plaintiffs' meaningful access to public education to which the minor plaintiffs have a right that included reasonable accommodations for their disabilities.

114.    Defendants Weisenburger, Guffin, Kaul, Neubert, and Rausch's conduct was willful, maliciously, purposely, intentionally or in reckless disregard of the minor plaintiffs' meaningful

access to public education, requiring minor plaintiffs to be the subject of verbal and physical abuse because of the minor children's disabilities, and the children's disabilities being a contributing factor in the defendants' decisions to engage in and permit such conduct.  The conduct thereby denied the minor plaintiffs' reasonable accommodations for their disabilities.

115.    The verbal and physical abuse including demeaning, belittling, invasive and humiliating remarks, the non-teaching, the pushing, shoving, dragging, and confining, forced undressing and dressing, forced intake of milk, use of purple band to tie child in place, the denial of water, lunch and restroom breaks, the denial of integrated lunch and recess, the denial of integration and access to instruction has created a separate class of students within ASD to which the minor plaintiffs belonged.

116.    The verbal and physical abuse of the minor plaintiffs was not rationally related to any legitimate public education purpose nor was it reasonable discipline; therefore, the named defendants' conduct was not performed in good faith but rather was motivated by malice and ill-will.

117.    The verbal and physical abuse including demeaning, belittling, invasive and humiliating remarks, the non-teaching, the pushing, shoving, dragging, and confining, forced undressing and dressing, forced intake of milk, use of purple band to tie child in place, the denial of water, lunch and restroom breaks, the denial of integrated lunch and recess, and the denial of integration and access to instruction was so outrageous as to shock the conscience and violated the minor plaintiffs' rights implicit in the concept of ordered liberty and justice.

118.    The verbal and physical abuse including demeaning, belittling, invasive and humiliating remarks, the non-teaching, the pushing, shoving, dragging, and confining, forced undressing and dressing, forced intake of milk, use of purple band to tie child in place, the denial of water, lunch

and restroom breaks, the denial of integrated lunch and recess, and the denial of integration and

access to instruction was taken by defendants under the color of state law or action: and

    a. Was made possible only because the defendants were clothed in the authority of public-school officials;

    b. Was made possible only because the defendants exercised power possessed by the defendants as public-school officials by virtue of State Law.

119.    The verbal and physical abuse including demeaning, belittling, invasive and humiliating

remarks, the non-teaching, the pushing, shoving, dragging, and confining, forced undressing and

dressing, forced intake of milk, use of purple band to tie child in place, the denial of water, lunch

and restroom breaks, the denial of integrated lunch and recess, and the denial of integration and

access to instruction was not rationally related to any legitimate public education purpose nor was

it reasonable discipline; and defendants did not conduct themselves in good faith but rather were

motivated by malice and ill-will.

120.    The verbal and physical abuse including demeaning, belittling, invasive and humiliating

remarks, the non-teaching, the pushing, shoving, dragging, and confining, forced undressing and

dressing, forced intake of milk, use of purple band to tie child in place, the denial of water, lunch

and restroom breaks, the denial of integrated lunch and recess, and the denial of integration and

access to instruction violated the minor plaintiffs' rights under the United States Constitution,

South Dakota Constitution, state and federal law, 42 U.S.C. § 1983, Title II of the Americans with

Disabilities Act, Section 504 of the Rehabilitation Act, South Dakota Human Rights Act to:

    a. Bodily integrity.
    b. Liberty from intentional or purposeful discrimination by State action exercised arbitrarily or capriciously.
    c. Procedural and substantive due process and equal protection under the laws.
    d. Meaningful public education.
    e. Integration with non-disabled peers.
    f. Freedom from discrimination as a result of the minor plaintiffs' disabilities, nor to have their disabilities as a contributing factor thereto.

121.    Reasonable education professionals with the named defendants' education, licensure, and experience knew or should have known that the actions described herein would violate the plaintiffs' clearly established constitutional and state rights and that their actions and inactions were arbitrary and capricious and would shock the consciences of individuals and the community given the vulnerability of the minor plaintiffs.  The named defendants further knew or should have known that their actions and inactions would result in the damage but were intentionally and recklessly indifferent to the plaintiffs' rights.

122.    On August 31, 2016, Emily Garcia, Director of Protection and Advocacy for Developmental Disabilities ("PADD"), after receiving reports from Jane and John Doe, filed a complaint with the United States Department of Education, Office of Civil Rights ("OCR") and the United States Department of Justice, Civil Rights Division ("DOJ") on behalf of all the named plaintiffs (OCR Complaint File No. 07-16-1912).  Prior to filing the complaint, Emily Garcia visited May Overby and met with defendants Camille Kaul, Renae Rausch, and Carrie Weisenburger to discuss the issues related to physical and emotional abuse of the children in Weisenburger's classroom.

123.    On February 1, 2017, OCR initiated an investigation into the allegations pursuant to Section 504 of the Rehabilitation Act ("Section 504") and Title II of the Americans with Disabilities Act of 1990 ("Title II").  OCR subsequently confirmed that OCR and DOJ would conduct a joint investigation.  The Complainants and ASD met with the OCR and DOJ representatives on December 12, 2017 to discuss the investigation.  In the meeting, OCR and DOJ confirmed that both had an on-going investigation and resolution discussions with ASD.  The plaintiffs asked to participate in the investigations and resolution in the resolution session between the agencies and ASD but OCR and DOJ declined.  From the time the complaint was filed to the

present, the plaintiffs have not been contacted by either OCR or the DOJ for the purpose of interviewing them, identifying collateral information sources or resolution of their claims. The meeting on December 12, 2017 was the last communication with the plaintiffs from either the OCR or the DOJ.

124.    On August 6, 2018, OCR submitted correspondence to the plaintiffs reflecting that ASD had voluntarily entered into a Resolution Agreement with OCR signed on May 31, 2018. OCR provided no findings regarding the allegations. The plaintiffs were not permitted to participate in the negotiations or the final agreement reached between the parties. OCR did not provide a finding related to its investigation and did not address the claims of the plaintiffs.

125.    After approximately two years of waiting for OCR and DOJ to conduct their investigations, the plaintiffs began looking for an attorney to represent their children's interests.   After months of calling attorneys in South Dakota and being rejected, the plaintiffs had to contact an out of state attorney to represent them.

126.    The plaintiffs were informed in August 2018 that the Department of Justice is continuing to investigate the complaint. The DOJ was not a participant in the Resolution Session between OCR and ASD.

## CLAIMS

## FIRST CLAIM

### VIOLATION OF CONSTITUTIONAL RIGHTS
### 42 U.S.C. § 1983
### ALL PLAINTIFFS V. DEFENDANTS ASD, GUFFIN, KAUL, MURLEY, NEUBERT, AND WEISENBURGER

127.    Plaintiffs incorporate and reallege by reference all preceding paragraphs as if they were fully set forth herein.

128.    Defendants ASD, Guffin, Kaul, Neubert, Murley, and Weisenburger violated minor plaintiffs A.A., B.B,. and C.C.'s rights under the Fourth Amendment to the United States Constitution by actions, including but not limited to: confining them in a closet for disciplinary purposes; using exercise bands, desks and mats for confinement and disciplinary purposes; grabbing, dragging, pulling, and restraining children with disabilities thereby using unjustified and unreasonable force against minor plaintiffs.

129.    Defendants ASD, Guffin, Kaul, Murley, Neubert, and Weisenburger violated minor plaintiffs A.A., B.B., and C.C.'s rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by actions, including but not limited to, depriving plaintiffs of equal protection under the law on the basis of their disability.

  a. Intentionally depriving them of their property interest in their education without due process of the law; and
  b. Intentionally depriving them of their substantive education.

130.    Defendants ASD, Guffin, Kaul, Neubert, and Weisenburger violated minor plaintiffs A.A., B.B., and C.C.'s rights under the Fourth Amendment to the United States Constitution by actions, including but not limited to, acting with deliberate indifference to the risk of harm to plaintiffs from Weisenburger.

  a. Intentionally using and permitting the use of excessive force with children whose disabilities rendered them vulnerable and unable to report such excessive force;
  b. Intentionally using and permitting the use of confinement in a closet as a disciplinary measure for children whose disabilities rendered them vulnerable and unable to report such confinement.

131.    Defendants ASD, Guffin, Kaul, Neubert, Murley, and Weisenburger violated plaintiffs Jane and John Doe, Jessica and James Doe, Jill and Jeff Doe's, along with A.A., B.B., and C.C.'s rights under the Due Process Clause to the Fourteenth Amendment to the United States Constitution by actions, including but not limited to:

a.   Intentionally interfering with the parent-child relationship by concealing information regarding the physical and emotional trauma inflicted on A.A., B.B., and C.C. by Weisenburger.

b.   Intentionally interfering with Jane and John Doe, Jessica and James Doe, Jill and Jeff Doe and A.A., B.B., and C.C.'s right to provide and receive nurture, support, and comfort regarding highly traumatic events.

c.   Intentionally interfering with A.A.'s right to a safe school environment through the implementation of the retaliatory "no touch" policy.

132.   As a result of defendants' actions and inactions, the plaintiffs have suffered damages including special and general damages according to proof.

## SECOND CLAIM

### DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. §§ 12101, *ET SET.*
### ALL PLAINTIFFS V. ASD

133.   Plaintiffs incorporate and reallege by reference all preceding paragraphs as if they were fully set forth herein.

134.   Effective January 26, 1992, plaintiffs were entitled to the protections of the "Public Services" provision of Title II of the Americans with Disabilities Act of 1990.

135.   Title II, Subpart A prohibits discrimination by any "public entity," including any state or local government, as defined by 42 USC § 12131, section 201 of the ADA. Pursuant to 42 USC §12132, Section 202 of Title II, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity. Plaintiffs A.A., B.B., and C.C. were at all times relevant herein a qualified individual with a disability as therein defined.

136.   Defendant ASD failed in its responsibilities under Title II to provide its services, programs and activities in a full and equal manner to disabled persons as described hereinabove, including failing to ensure that educational services are provided on an equal basis to children with

34

disabilities and free of hostility toward their disability.

137.    Defendant ASD has further failed in its responsibilities under Title II to provide its services, programs, and activities in a full and equal manner to disabled persons as described hereinabove by subjecting plaintiffs to a hostile educational environment.

138.    Defendant ASD engaged in retaliation and reprisals against plaintiff A.A. After the OCR complaint was filed in August 2016, ASD employees implemented a "no touch" policy over the parents' objections.  The "no touch" policy adversely impacted A.A.'s clearly identified disability related education and physical safety needs, as well as denying her the right to participate in ASD sponsored Special Olympic events requiring adult assistance.

139.    As a result of ASD's failure to comply with its duty under Title II, the plaintiffs have suffered damages including special and general damages according to proof.

**THIRD CLAIM**

**VIOLATION OF THE REHABILITATION ACT OF 1973**
**29 USC §§ 794, *ET SEQ*.**
**ALL PLAINTIFFS V. ASD**

140.    Plaintiffs incorporate and reallege by reference all preceding paragraphs as if they were fully set forth herein.

141.    ASD is and has been at all relevant times the recipient of federal financial assistance, and that part of that financial assistance has been used to fund the operations, construction and/or maintenance of the specific public facilities described herein and the activities that take place therein.

142.    By their actions or inactions in denying equal access to educational services and by subjecting plaintiffs A.A., B.B., and C.C. to a hostile educational environment, defendant has

violated plaintiff A.A.'s, B.B.'s, and C.C.'s rights under § 504 of the Rehabilitation Act of 1973, 29 USC § 794, and the regulations promulgated thereunder.

143.    Defendant ASD engaged in retaliation and reprisals against plaintiff A.A. after the OCR complaint was filed when it implemented a "no touch" policy over the parents' objections. The "no touch" policy adversely impacted A.A.'s identified disability related education and physical safety needs and denied her participation in ASD sponsored Special Olympic events requiring adult assistance.

144.    As a result of ASD's failure to comply with its duty under § 504 of the Rehabilitation Act of 1973, 29 USC § 794, and the regulations promulgated thereunder, the plaintiffs have suffered damages including special and general damages according to proof.

**FOURTH CLAIM**

**VIOLATION OF THE SOUTH DAKOTA HUMAN RIGHTS ACT
SDCL CHAPTER 20, SECTION 13**

**ALL PLAINTIFFS V. ASD**

145.    Plaintiffs incorporate and reallege by reference all preceding paragraphs as if they were fully set forth herein.

146.    Defendant ASD is a public education institution as that term is used by the South Dakota Human Rights Act ("SDHRA"), SDCL Chapter 20, Section 12.  Defendant ASD is subject to the duties and obligations to qualified individuals with disabilities to attend the education program.

147.    The minor plaintiffs are qualified individuals entitled to the protections under the SDHRA in the public education setting on the basis of their disabilities.

148.    Defendant ASD violated the minor plaintiffs' rights under the SDHRA when its employees, agents, independent contractors, aides and volunteers' denied the minor plaintiffs reasonable accommodations and modifications, thus denying each minor plaintiff the full utilization of or

benefit from their education.   Defendant ASD's policies and procedures provide for accommodations and modifications for a disabling condition within the public education setting.

149.    The modifications and accommodations requested for the minor plaintiffs were reasonable and would not cause undue hardship for defendant ASD.

150.    To the degree defendant ASD provided modifications and accommodations to the minor plaintiffs, those accommodations were provided on an *ad hoc* basis based on the education professionals' preferences rather than the minor plaintiffs' disability-related needs.

151.    Defendant ASD violated the SDHRA by subjecting the minor plaintiffs to the adverse impact of the *ad hoc* accommodations and modifications.

152.    Defendant ASD subjected the minor plaintiffs to excessive force and discipline because of their disabilities.   The excessive force and discipline was a pretext for discriminating against the minor plaintiffs because of their disabilities.   Defendant ASD violated its own adopted policies and procedures.

153.    Defendant ASD engaged in retaliation and reprisals against plaintiff A.A. after the OCR complaint was filed when it implemented a "no touch" policy over the parents' objections. The "no touch" policy adversely impacted A.A.'s identified disability related and physical safety needs and denied her participation in ASD sponsored Special Olympic events requiring adult assistance.

154.    Defendant ASD's violations of the minor plaintiffs' rights under the SDHRA were intentional, grossly, recklessly, and deliberately indifferent to the minor plaintiffs' rights.   As a result of the defendant ASD's discriminatory conduct, the plaintiffs have suffered damages including special and general damages according to proof.

### FIFTH CLAIM

### VICARIOUS LIABILITY/NEGLIGENCE
### ALL PLAINTIFFS V. ASD

155.   Plaintiffs incorporate and reallege by reference all preceding paragraphs as if they were fully set forth herein.

156.   At all times relevant herein, the defendant ASD employees, agents, independent contractors, aides and volunteers were acting within the scope of their employment and were performing specific duties on behalf of defendant ASD.

157.   At all times relevant herein, the defendant ASD employees, agents, independent contractors, aides and volunteers' actions or inaction were in furtherance of performing ministerial duties that were not discretionary or policy-making nature.

158.   Defendant ASD employees, agents, independent contractors, aides and volunteers failed to exercise or utilize ordinary care in supervising, protecting and overseeing the minor plaintiffs, permitting the physical and emotional abuse to occur.

159.   ASD owed the minor plaintiffs a duty of care consistent, at a minimum, with its own policies and procedures related to supervision and training, the maltreatment of minors, the use of force, and discipline.

160.   The minor plaintiffs were required under the South Dakota compulsory attendance requirement, SDCL 13-27-1.

161.   Neglect occurred as a result of and was proximately caused by the careless, negligent, grossly careless and reckless conduct of defendant ASD employees, agents, independent contractors, aides and volunteers which consisted of, *inter alia*, the following:

   a.   Failure to properly supervise and train its personnel regarding its policies and procedures;
   b.   Failure to undertake its mandatory duties to investigate, report, and discipline individuals involved in physical and emotional abuse of the minor plaintiffs;
   c.   Failure to undertake its mandatory duties to investigate, report, and remediate discriminatory practices against the minor plaintiffs;
   d.   Failure to inform the parents of the emotional and physical abuse taking place within the education setting;

    e.  Failure to exercise the ordinary care in responding to allegations of verbal and physical abuse involving the minor plaintiffs;

    f.  Failure to exercise ordinary care in responding to allegations of retaliation and reprisals against the minor plaintiff A.A.;

    g.  ASD failed to otherwise comply with the applicable laws and regulations of the State of South Dakota and the applicable federal laws and regulations;

    h.  ASD failed to exercise the degree of care required under the circumstances; and

    i.  Has been otherwise negligent.

162.    The physical and emotional abuse and neglect by defendant ASD employees, agents, independent contractors, aides and volunteers was foreseeable for which reasonable and prudent education professionals would take precautions and act upon.

163.    As a result of the conduct described herein, defendant ASD employees, agents, independent contractors, aides and volunteers breached its duties of care owed to the minor plaintiffs for which they sustained injuries, losses, and damages which are more fully described above and for which the plaintiffs did not contribute any degree of negligence.

164.    As a result of the defendants' conduct, described herein, the plaintiffs have suffered damages including special and general damages according to proof.

### JURY REQUEST

Plaintiffs hereby request that this matter be tried by a jury.

### PRAYER AND RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

1. General and Non-Economic damages in excess of $75,000.00 for the plaintiffs according to proof;
2. Special and Economic damages according to proof;
3. Punitive damages against defendants Guffin, Kaul, Rausch, Neubert, and Weisenburger;
3. Costs of suit including attorney's fees and costs; and
4. Such other and further relief as the court deems just and proper.

Respectfully submitted,

Dated: December 21, 2018     /s/ Hilary Johnson
Hilary Johnson /SDID # 4533
PO Box 173
Aberdeen, South Dakota 57402
Tel. 910.650.0551
hilaryj17@yahoo.com

Attorney for Plaintiffs

## CONFIDENTIAL VERIFICATION

    I verify that I have read the foregoing Complaint, and that all of the facts and statements

made therein are true and correct to the best of my knowledge, as to the attached documents they

are true and correct copies, and as to those facts stated on information and belief, I also believe

them to be true and correct.

Dated:                              _____

                                      Confidential Jane Doe signature

Subscribed and sworn to before me
this _____ day of December 2018.


_____
Notary Public

40

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a)  PLAINTIFFS

## DEFENDANTS

**(b)**  County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
       Plaintiff

☐ 3   Federal Question
       *(U.S. Government Not a Party)*

☐ 2   U.S. Government
       Defendant

☐ 4   Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane      ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product            Product Liability |  |    28 USC 157 |    3729(a)) |
| ☐ 140 Negotiable Instrument |      Liability      ☐ 367 Health Care/ |  |  | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &           Pharmaceutical |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
|     & Enforcement of Judgment |      Slander           Personal Injury |  | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'           Product Liability |  | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |      Liability      ☐ 368 Asbestos Personal |  | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
|     Student Loans | ☐ 340 Marine           Injury Product |  |    New Drug Application | ☐ 470 Racketeer Influenced and |
|     (Excludes Veterans) | ☐ 345 Marine Product           Liability |  | ☐ 840 Trademark |    Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |      Liability    **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
|     of Veteran's Benefits | ☐ 350 Motor Vehicle      ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle      ☐ 371 Truth in Lending |      Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract |      Product Liability      ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) |    Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal           Property Damage |      Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |      Injury      ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
|  | ☐ 362 Personal Injury -           Product Liability | ☐ 751 Family and Medical |  | ☐ 893 Environmental Matters |
|  |      Medical Malpractice |      Leave Act |  | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** |      Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights    **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting      ☐ 463 Alien Detainee |      Income Security Act |      or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment      ☐ 510 Motions to Vacate |  | ☐ 871 IRS—Third Party |      Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/           Sentence |  |    26 USC 7609 |      Agency Decision |
| ☐ 245 Tort Product Liability |      Accommodations      ☐ 530 General |  |  | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -      ☐ 535 Death Penalty | **IMMIGRATION** |  |      State Statutes |
|  |      Employment    **Other:** | ☐ 462 Naturalization Application |  |  |
|  | ☐ 446 Amer. w/Disabilities -      ☐ 540 Mandamus & Other | ☐ 465 Other Immigration |  |  |
|  |      Other      ☐ 550 Civil Rights |      Actions |  |  |
|  | ☐ 448 Education      ☐ 555 Prison Condition |  |  |  |
|  |      ☐ 560 Civil Detainee - |  |  |  |
|  |           Conditions of |  |  |  |
|  |           Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1   Original
       Proceeding

☐ 2   Removed from
       State Court

☐ 3   Remanded from
       Appellate Court

☐ 4   Reinstated or
       Reopened

☐ 5   Transferred from
       Another District
       *(specify)*

☐ 6   Multidistrict
       Litigation -
       Transfer

☐ 8   Multidistrict
       Litigation -
       Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.**  (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**   **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.