

FILED

SEP 2 0 2021

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| JANE DOE, INDIVIDUALLY AND ON BEHALF OF THEIR MINOR CHILD, A.A.; JOHN DOE, INDIVIDUALLY AND ON BEHALF OF THEIR MINOR CHILD, A.A.; JESSICA DOE, INDIVIDUALLY AND ON BEHALF OF THEIR MINOR CHILD, B.B.; JAMES DOE, INDIVIDUALLY AND ON BEHALF OF THEIR MINOR CHILD, B.B.; JILL DOE, INDIVIDUALLY AND ON BEHALF OF THEIR MINOR CHILD, C.C.; AND JEFF DOE, INDIVIDUALLY AND ON BEHALF OF THEIR MINOR CHILD, C.C.; JANET DOE, INDIVIDUALLY AND ON BEHALF OF HER MINOR CHILD, D.D.; AND JULIE DOE, INDIVIDUALLY AND ON BEHALF OF HER MINOR CHILD, E.E., | 1:18-CV-01025-CBK |
| Plaintiffs, | |
| vs. | MEMORANDUM AND ORDER |
| ABERDEEN SCHOOL DISTRICT, BECKY GUFFIN, IN HER INDIVIDUAL AND OFFICIAL CAPACITY; CAMILLE KAUL, IN HER INDIVIDUAL AND OFFICIAL CAPACITY; RENAE RAUSCH, IN HER INDIVIDUAL AND OFFICIAL CAPACITY; COLLEEN MURLEY, IN HER INDIVIDUAL AND OFFICIAL CAPACITY; MICHAEL NEUBERT, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; CARRIE WIESENBURGER, IN HER INDIVIDUAL AND OFFICIAL CAPACITY; AND DOES 1-2, | |
| Defendants. | |

**INTRODUCTION**

This matter is before the Court on defendants' Aberdeen School District ("ASD"), Becky Guffin, Camille Kaul, Renae Rausch, Colleen Murley, Michael Neubert, and Carrie Weisenburgers' ("defendants") six motions for summary judgment, five motions related to plaintiffs' claims under the United States Constitution, via 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. §§ 794, *et seq.*, the South Dakota Human Rights Act ("SDHRA"), SDCL Chapter 20, § 13, and negligence under South Dakota Law, and one motion shielding defendants from any liability under Monell v. Department of Social Services, 436 U.S. 658 (1978) and under qualified immunity.

At the outset, in this very lengthy opinion, as the attorneys well know, this Court is not finding facts. Nor do I find that any defendant is liable. I am dismissing some claims, granting or denying motions, and determining which claims are to be decided by a jury because genuine material issues of fact exist.

This lawsuit has caused the destruction of a small forest. Hopefully, we can end this and proceed to trial.

**I.    BACKGROUND**

The alleged events giving rise to this action transpired over the course of two school years, 2014/15 and 2015/16, in the Enrich II classroom at May Overby Elementary ("May Overby") in Aberdeen, South Dakota. May Overby is a South Dakota public school and is part of ASD. Plaintiffs' minor children are all students with disabilities that require special care. Three of the five children are non-verbal and none of the five could verbalize any problems or alleged abuse at May Overby to parents or loved ones. Throughout all relevant times, each minor child has had an individualized education program ("IEP") as required by State and Federal law. While at May Overby, each minor child was taught by defendant Weisenburger.

2

Plaintiffs Jane and John Does' minor child, A.A., has been diagnosed with autism spectrum disorder and moderate cognitive disability. While verbal, A.A. is unable to directly communicate experiences from school to parents. A.A. was in the third and fourth grade during the 2014/15 and 2015/16 school years, respectively. Plaintiffs allege that A.A. regularly endured physical and emotional abuse at the hands of defendant Weisenburger and her education aides. While there was an amendment to A.A.'s behavior plan which allowed for the use of seclusion in a separate room, it was discontinued after Jane Doe expressed concern with how many hundreds of times A.A. was subjected to the small, windowless room. Despite the U.S. Department of Education only recommending the seclusion room when a child is an imminent danger to herself or others, A.A. would be placed into the room despite no evidence she was a threat to herself or anybody else at May Overby, including for minor infractions such as not properly hanging up her coat and pushing a cabinet.

Plaintiff Jessica Doe's[1] minor child B.B. was in the third and fourth grade during the 2014/15 and 2015/16 school years, respectively. B.B. has been diagnosed with autism, attention deficit hyperactivity disorder, and chronic anxiety. He is non-verbal. Plaintiffs have alleged that B.B. was the subject of physical and emotional abuse in defendant Weisenburger's classroom, including being forced into a pool against his will. Like A.A., B.B. would be forced into the small seclusion room without reports he was a danger to himself or others.

C.C., daughter of Jill and Jeff Doe, was diagnosed with mild to moderate inner ear hearing loss and is non-verbal. C.C. was in the third and fourth grades during the 2014/15 and 2015/16 school years, respectively. Plaintiffs also claim that C.C. would be regularly subjected to physical and emotional abuse at the hands of defendant Weisenburger and aides, including on one instance being forcibly stripped by Weisenburger at the Aberdeen YMCA locker room, resulting in C.C. screaming so loudly

---

[1] Plaintiffs agree to defendants' dismissal of James Doe, B.B.'s stepfather, from this suit.

that a concerned passerby came into the changing area to ensure the safety of whoever yelled.

Plaintiff Janet Doe's minor child, D.D., is a non-verbal boy who was in the third and fourth grades during the 2014/15 and 2015/16 school years, respectively. D.D. has a rare genetic disorder which impacts his development and inhibits his capacity to pursue common tasks like toileting and wiping away excess salivation. D.D. would often be left – alone – in the hallway, where staff contended they could still watch him from the classroom. On one occasion, defendant Weisenburger told D.D. that he smelled, that he was disgusting, and informed him that "even his spit was gross and it smelled." Weixel transcript, Doc. 104-9 at 63–64. Because of his disability, D.D. struggled with basic bodily functions like excess salivation, which would not be wiped off him until he was "really wet," and instead would sit for long lengths of time in spittle. Id. at 73. Janet Doe also reported that he would often come home with unchanged diapers, urine-soaked clothing, and developed a rash and sores around his mouth due to how salivation was wiped away by ASD staff.

Lastly, Julie Doe's daughter E.E. is verbal, but holds only limited language skills and was not able to communicate the experiences she had at May Overby to her mother. E.E. has been diagnosed with a moderate cognitive disability. Like A.A., B.B. and C.C., E.E. was often subjected to the seclusion room. When E.E. would act out and try to stand out of her chair during class, defendant Weisenburger repeatedly tied an exercise belt around her stomach. The belt would be tied behind her back and behind the chair so she could not "wiggle or anything." Bellefuille transcript, Doc. 104-1 at 47–48. On other occasions defendant Weisenburger would gossip about E.E.'s parents, referring to them as "drug users and losers." Id. at 24. Plaintiffs also allege that defendant Weisenburger would check E.E.'s underwear and report whether they were the same as the previous day loudly enough for the class to hear.

Plaintiffs' claims center around the experiences these minor children endured in defendant Weisenburger's classroom at May Overby, as well at other locations. Plaintiffs filed suit against the other individually named defendants due to their supervisory

4

responsibilities within ASD, their alleged inaction in responding to allegations of misconduct by Weisenburger, the alleged lack of meaningful oversight of Weisenburger's conduct, and the lack of policies surrounding restraint and seclusion within the school.  On January 28, 2016, defendant Weisenburger was placed on a plan of assistance because "it was revealed student behavior plans and classroom expectations were not being effectively communicated to the aides, creating inconsistency in how staff addressed teaching and student behaviors."  DEFENDANTS STATEMENT OF UNDISPUTED MATERIAL FACTS REGARDING STUDENT CC, Doc. 83 at 4.  Three months later, in April 2016, A.A.'s mother observed defendant Weisenburger and her aides forcing a child to swim at the Aberdeen YMCA.  Upon investigation by defendant Kaul, defendant Weisenburger and her aides were reprimanded for improper restraint when forcing the child to swim despite protestations.  Shortly thereafter defendant Weisenburger resigned.

In early August 2016, C.C.'s sign language interpreter Ms. Ava Weixel met with A.A.'s parents outside of May Overby to discuss her concerns about the treatment students were enduring in Enrich II.  A few weeks later on August 31, after being apprised of the reports made to A.A.'s parents, Emily Garcia, Director of Protection and Advocacy for Developmental Disabilities, filed a complaint with the Office of Civil Rights ("OCR") at the United States Department of Education and the United States Department of Justice, Civil Rights Division.  On August 9, 2018, the Office of Civil Rights issued its letter summarizing the preliminary information gathered, which highlighted the fact that "ASD did not have a district-wide policy regarding the appropriate use of restraint and seclusion . . . The joint investigation also revealed that ASD did not provide training on the appropriate use of seclusion.  Accordingly, various school personnel were utilizing seclusion as a disciplinary measure to routinely address behaviors that were a manifestation of a disability."  See OCR Report, Doc. 114-28 at 1–2 (explaining prior findings).

This suit commenced on December 21, 2018, for A.A., B.B., and C.C.  Doc. 1.  On September 27, 2019, the Court denied defendants' motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), with

defendants arguing because plaintiffs did not exhaust their administrative remedies under the Individuals with Disabilities Education Act ("IDEA"), this suit could not proceed. Doc. 49.  The Court denied defendants' motion because the gravamen of plaintiffs' claims is not centered around their denial of a free appropriate public education ("FAPE"), but instead focused on the alleged abuse that was endured at May Overby and elsewhere.  See id. at 6–10.  "While this lawsuit's relationship to education is unavoidable (the school being the location where much of the alleged abuse took place and the children's teacher being the primary alleged abuser), that does not necessarily mean plaintiffs are suing for a denial of a FAPE."  Id. at 9.

D.D. and E.E. subsequently joined this suit on March 23, 2020.  Doc. 63.  On May 5, 2021, defendants filed five motions for summary judgment on all of plaintiffs' claims, raising statute of repose and limitations arguments, as well as on the merits.  Docs. 75, 78, 81, 84, & 87.  Defendants also filed a separate motion for summary judgment on the same day asserting Monell immunity from suit for ASD, as well as qualified immunity for the individually named defendants.  Doc. 92.  Plaintiffs filed their first response on May 27, 2021, Doc. 107, which was amended on August 24, 2021.  Doc. 140. Defendants filed their six reply briefs on June 9, 2021.  Docs. 120, 122, 123, 124, 125, & 126.  These matters are now ripe for decisions.

## II.  DISCUSSION

### A. Legal Standard

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Knutson v. Schwan's Home Serv., Inc., 711 F.3d 911, 913 (8th Cir. 2013).  The United States Supreme Court has held that:

> The plain language of Rule 56(c) mandates the entry
> of summary judgment . . . against a party who fails to make a showing
> sufficient to establish the existence of an element essential to that party's
> case, and on which that party will bear the burden of proof at trial.  In such
> a situation, there can be no genuine issue as to any material fact, since a

complete failure of proof concerning an essential element of the non-
moving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (internal quotations omitted).

"As to materiality, the substantive law will identify which facts are material.
Only disputes over facts that might affect the outcome of the suit under the governing law
will properly preclude the entry of summary judgment. Factual disputes that are
irrelevant or unnecessary will not be counted." Id. at 248. That is, to
make summary judgment inappropriate, there must be a factual dispute concerning facts
the existence or nonexistence of which would "be outcome determinative under [the]
prevailing [substantive] law." Grey v. City of Oak Grove, Missouri, 396 F.3d 1031, 1034
(8th Cir. 2005).

Thus, in accordance with Rule 56(c), the party seeking summary judgment must first
identify grounds demonstrating the absence of a genuine issue of material fact. Celotex
Corp., 477 U.S. at 323. Upon such a showing, the burden shifts to the non-movant to
present affirmative evidence, beyond the pleadings, showing that a genuine issue of
material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256–57 (1986). To
meet its burden, the non-movant "must do more than simply show that there is some
metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio
Corp., 475 U.S. 574, 586 (1986). Rather, the non-movant must be able to "show there is
sufficient evidence to support a jury verdict in [its] favor." Nat'l Bank of Com. v. Dow
Chem. Co., 165 F.3d 602, 607 (8th Cir. 1999). After this exercise, "we view the facts
and the inferences to be drawn from them in the light most favorable to the nonmoving
party." Northport Health Servs. of Arkansas, LLC v. Posey, 930 F.3d 1027, 1030 (8th
Cir. 2019).

### B. IDEA Exhaustion

Defendants have again brought before the Court an already disposed of argument
arguing plaintiffs' claims are barred for failing to comply with the exhaustion
requirements of the IDEA. See, e.g., Doc. 76 at 6–10. But the Court has already set
aside such arguments, noting that the "gravamen of plaintiffs' complaint in the instant

case is not a denial of a [free appropriate public education]," and instead has noted that "[t]he fact that any abuse may have hindered these disabled children's education is, at best, a tangential part of plaintiffs' claims, not the crux of their complaint." See MEMORANDUM AND ORDER DENYING MOTION TO DISMISS, Doc. 49 at 6–10. Defendants' recycled arguments concerning exhaustion under IDEA are without merit.

### C. Dismissal of James Doe from Suit

In their briefing for summary judgment, plaintiffs agree to the dismissal of James Doe as the stepfather of plaintiff B.B from this suit. PLAINTIFFS AMENDED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, Doc. 140 at 5. The Court will grant the dismissal of James Doe.

### D. Statute of Limitations, Repose for Plaintiffs' Constitutional and Statutory Claims

#### 1. *Whether § 1983 Claims are Governed by Statute of Limitations or Repose*

Before delving into the merits of the parties' claims, defendants raise statute of repose concerns surrounding all events alleged to have taken place in the 2014/15 school year, as well as the entirety of § 1983 claims raised by the later-included D.D. and E.E. plaintiffs. Defendants argue that the relevant state statute on when § 1983 claims may be raised, SDCL 15-2-15.2, is in fact a statute of repose and thus the Court cannot exercise equitable tolling to extend the applicable filing period. In turn, plaintiffs contend that the applicable clock began when Ms. Ava Weixel reported concerns about A.A. to Jane Doe, for all plaintiffs. Because statutes of repose do not extend filing deadlines based on when an aggrieved party may have learned of the grounds for a cause of action, but instead at the conclusion of the event that *caused* the alleged wrongdoings, a statute of repose in this instance would begin when the alleged abuse of the children took place.

A statute of repose "'effect[s] a legislative judgment that a defendant should be free from liability after the legislatively determined period of time,'" measuring the applicable period for commencing suit by the occurrence of the injury, *not* from subsequent actions or belated discoveries of the purported harm. In re Wintersteen Revocable Trust Agreement, 907 NW2d 785, 793 (S.D. 2018) (*quoting* Pitt-Hart v.

8

Sanford USD Med. Ctr., 878 NW2d 406, 414 (S.D. 2016)).  While similar to a statute of limitations in that "both establish time limits governing commencement of an action by a claimant, there are key distinctions between the two."  Id.

"The unqualified nature" of a statute of repose "supersedes the courts' residual authority and forecloses the extension of the statutory period based on equitable principles" such that equitable remedies are unavailable to prolong a filing period for plaintiffs.  California Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc., ___ U.S. ___, 137 S.Ct. 2042, 2051 (2017).  While courts may toll statute of limitations, "'statutes of repose effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time.'"  In re Wintersteen Recovable Trust Agreement, 907 NW2d at 793 (*quoting* Pitt-Hart, 878 NW2d at 414).  The Supreme Court of South Dakota has made this point clear: "With the expiration of the period of repose, the putative cause of action evanesces; life cannot thereafter be breathed back into it."  Id. (*quoting* Clark Cty. v. Sioux Equip. Corp., 753 NW2d 406, 416 (S.D. 2008); see also Robinson-Podoll v. Harmelink, Fox & Ravnsborg Law Off., 939 NW2d 32, 40 (S.D. 2020) ("A statute of limitations creates a time limit for suing in a civil case, based on the date when the claim accrued.  A statute of repose, on the other hand . . . is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant.") (*quoting* Pitt-Hart, 878 NW2d at 413).

South Dakota's Supreme Court has also highlighted the varying terminology that signifies a statute of repose versus a statute of limitation.  See Pitt-Hart, 878 NW2d at 413 (comparing a statute of repose when the statutory text stated "[a]n action . . . can be commenced only within two years after the alleged malpractice, error, mistake, or failure to cure shall have *occurred*" (emphasis added), *with* "[a]n action for personal injury can be commenced only within three years after the cause of action shall have *accrued* . . .") (emphasis added).  See also id. ("A statute of repose, on the other hand, . . . is measured not from the date on which the claim *accrues* but instead from the date of the last culpable act or omission of the defendant." (emphasis added)).

9

The length of the statute of limitations in a § 1983 action "is that which the State provides for personal-injury torts."  Wallace v. Kato, 549 U.S. 384, 387 (2007).  South Dakota adopted a specific statute of limitations for § 1983 actions.  Pursuant to SDCL 15-2-15.2, "[a]ny action brought under the federal civil rights statutes may be commenced only within three years after the alleged constitutional deprivation has occurred."

SDCL 15-2-15.2's language properly constitutes a statute of repose, *not* a statute of limitations.  In Pitt-Hart v. Sanford USD Medical Center, the State Supreme Court made clear the critical distinction between SDCL 15-2-14.1's use of the term "occur" – a statute of repose – with SDCL 15-2-14(3)'s use of the term "accrued" – constituting a statute of limitation.  Pitt-Hart, 878 NW2d at 413.  It is critical that a "repose period is fixed" from the time the alleged injury *occurred*, *not* when an aggrieved party may have become aware of such an alleged wrong.  Id.  The "wisdom" of using a statute of repose against highly vulnerable children, some of whom are non-verbal, is not for the Court to say.  Likewise, whether the South Dakota Legislature should have protected such children is not for this Court to say.

D.D. and E.E. joined the three other sets of parents and children in this lawsuit on March 23, 2020, through plaintiffs' Amended Complaint.  The latest allegation by D.D. or E.E. against ASD took place within the 2015/16 school year.  While the legislature's use of "occur" versus "accrued" in SDCL 15-2-15.2 may at first glance appear "merely semantic," the specific terminology reflects the legislature's intent to not permit equitable tolling of claims, regardless of when an aggrieved party may have discovered its claim.  Clark Cty. v. Sioux Equip. Corp, 753 NW2d 406, 415 (S.D. 2008).  As of 2019, E.E.'s "cause of action evanesces; life cannot thereafter be breathed back into it."  Id. (*quoting* Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co., 419 F.3d 355, 363 (5th Cir. 2005)).  Despite D.D. and E.E.s' attempts to circumvent the applicable statute of repose, the last events to have *occurred* to constitute these claims are those instances of alleged abuse towards the children plaintiffs, *not* when parents may have discovered any possible wrongdoing.  However, the question of whether the conduct that allegedly took place

earlier than three years of filing of the Complaint may be considered in relation to A.A., B.B., and C.C. by the Court requires further scrutiny.[2]

The final statute of repose-related question that remains is whether the Court can consider the alleged actions that took place more than three years prior to December 21, 2018, for plaintiffs A.A., B.B., and C.C.

Whether this Court can take into consideration allegations that took place earlier than three years prior to A.A., B.B., and C.C.s' Complaint being filed for claims under § 1983 appears to be an unanswered question of South Dakota law.  The South Dakota Supreme Court has made clear that "[w]hile the continuous-treatment rule does not apply to a statute of repose, the continuing-tort doctrine does." Zoss v. Protsch, 2021 WL 1312868 at *2 (D.S.D.) (*unpublished*) (*quoting* Pitt-Hart v. Sanford USD Med. Ctr., 878 NW2d 406, 415 (S.D. 2016)).  Appearing in medical malpractice law as well as other fields, under the continuing tort doctrine, the applicable clock for a statute of repose or limitation does not begin to run until "'the date of the last culpable act or omission of the defendant.'" Robinson-Podoll v. Harmelink, Fox & Ravnsborg Law Off., 939 NW2d 32, 40 (S.D. 2020) (*quoting* Pitt-Hart, 878 NW2d at 413).   The doctrine allows courts to look at all alleged transgressions that together culminate in the "cumulative effect[s] of several [actions] rather than the result of a single act." Pitt-Hart, 878 NW2d at 415.  In Pitt-Hart, the South Dakota Supreme Court cited favorably to the Illinois Supreme Court's holding in Cunningham v. Huffman that stressed the need to look to whether the alleged transgressions are "'so related as to constitute one continuing wrong.'" Pitt-Hart, 878 NW2d at 415 (*quoting* Cunningham v. Huffman, 609 NE2d 321, 325 (Ill. 1993)).  When all allegations are so interconnected as to establish a wider pattern, South Dakota's precedent effectuates an intent to look at all events that constitute the cause of action.

The Court finds similarities between the continuing tort doctrine's applicability for statutes of repose within the medical malpractice field and for § 1983 claims' statute of repose under South Dakota law.  In both circumstances plaintiffs allege a "cumulative

---

[2] Because D.D. and E.E.s' § 1983 claims do not survive their statute of repose, their claims are not further discussed in relation to the continuing tort doctrine.

effect" of a series of alleged wrongs culminating in a single cause of action, whether it be a myriad of flawed procedures and operations or repeated instances of constitutional harm by government actors. Id. Both situations demand courts and juries consider the series of events that lead to the cause of action at hand. Here, regardless of whether the first alleged transgressions occurred more than three years prior to the filing of the Complaint, the Court may entertain evidence stretching into the 2014/15 school year for A.A., B.B., and C.C.s' claims because these events cumulatively constitute such plaintiffs' § 1983 claims.

Because A.A., B.B., and C.C. all properly filed their § 1983 claims within the applicable timeframe to satisfy the statute of repose, the cumulative events that took place prior to three years before their filing deadline – specifically, the 2014/15 school year – may be considered by the Court on summary judgment.

Since D.D. and E.E. waited to join this Complaint until more than a year after the deadline to satisfy SDCL 15-2-15.2's statute of repose, their § 1983 claims must be dismissed. However, all allegations from the 2014/15 school year for plaintiffs A.A., B.B., and C.C. may be considered.

2. *Whether Statute of Limitations has run on D.D. and E.E.s' Claims under ADA/Rehabilitation Act*

Defendants also contend that under the applicable statute of limitations for plaintiffs' ADA and § 504 claims, D.D. and E.E. are time-barred from asserting their statutory claims.

Plaintiffs do not appear to contest defendants' assertion that the proper statute of limitations – *not* repose – for the ADA and Rehabilitation Act claims is SDCL 15-2-14(3)'s three years. See Strawn v. Missouri State Bd. of Educ., 210 F.3d 954, 957 (8th Cir. 2000) (instructing courts that "[w]hen a federal law contains no statute of limitations, courts may borrow from the most closely analogous state statute of limitations unless doing so would frustrate the policy embodied in the federal law on which the claim is based."). Defendants claim that D.D. and E.E.s' ADA and Rehabilitation Act claims are time-barred, that they cannot be tolled for minority status, and that they have been

"discovered" more than three years prior to their joining of the lawsuit.  Plaintiffs contend that there *is* permissible minority tolling for the two children's statutory claims, that they can file their statutory claims under the discovery rule, and if there are any time-bars to D.D. and E.E.s' claims they are null due to defendants' concealment of material facts.

First, the Court finds that the statute of limitations for D.D. and E.E.s' ADA and Rehabilitation Act claims cannot be tolled under South Dakota tolling provisions.  In Strawn v. Missouri State Board of Education, the United States Court of Appeals for the Eighth Circuit held that a similar Missouri state tolling provision could not be applied under the IDEA due to it frustrating federal policy.  Id. at 958.  The Strawn Court held that federal policy required "expeditious resolution of IDEA concerns" to prevent the "substantial harm" of lost education on the part of students.  Id.  See also Murphy v. Timerblane Reg'l Sch. Dist., 22 F.3d 1186, 1193–94 (1st. Cir. 1994) (holding a core tenet of IDEA was to ensure students are not forced to lose "day after irreplaceable day of educational opportunity mandated by law.").  Concerns of applying South Dakota's tolling provision to the ADA and Rehabilitation Act are analogous to the concerns presented under Missouri Law in Strawn: to expedite the resolution of claims under these federal statutes – and fulfill the policies of the statutes – state tolling provisions cannot be applied.  Holding that the South Dakota tolling provision for minority or disability is inapplicable within the IDEA, ADA, and Rehabilitation Act contexts, the Court next turns to whether the "discovery rule" can extend the applicable statute of limitations for D.D. and E.E.

As the Court has noted, plaintiffs do not appear to contest defendants' assertion that the applicable statute of limitation for the ADA and Rehabilitation claims is SDCL 15-2-14(3).  Under the "discovery rule," some South Dakota statute of limitations do not begin to run "until a claimant receives actual or constructive notice of her right to sue." Baye v. Diocese of Rapid City, 630 F.3d 757, 760 (8th Cir. 2011).  However, South Dakota requires a statute of limitation to have an "explicit statutory authorization" that the specific statute in question permits the discovery rule.  Id. (*citing* Shippen v. Parrott,

506 NW2d 82, 85 (S.D. 1993), overruled on other grounds by Jensen v. Kasik, 7577 NW2d 87, 89 (S.D. 2008); Alberts v. Giebink, 299 NW2d 454, 455 (S.D. 1980)).  But here, SDCL 15-2-14(3) does *not* contain such a discovery rule.  See id. at 760 (*citing* to this subsection as an example of a statute that holds no explicit discovery rule).  Because there is no discovery rule written into SDCL 15-2-14(3), the claims for D.D. and E.E. cannot be based on their discovery of the conduct that occurred within ASD's confines.

Plaintiffs assert the statute of limitations is tolled for D.D. and E.E. due to the fraudulent concealment by ASD concerning the extent of harm being inflicted upon their children.  Fraudulent concealment "tolls the statute of limitations until the cause of action is discovered or might have been discovered by the exercise of diligence."  One Star v. Sisters of St. Francis, Denver, Colorado, 752 NW2d 668, 681 (S.D. 2008) (*citing* Hinkle v. Hargens, 81 NW2d 888, 890–91 (S.D. 1957)).  When there is a trust or confidential relationship – such as between teacher and pupil and parent – "an affirmative duty to disclose is imposed, and mere silence by the party under that duty constitutes fraudulent concealment."  Id.  The silence on the part of the defendants "must concern defects which the party with the duty to disclose knew or should have known."  Id. (*citing* Holy Cross Parish v. Huether, 308 NW2d 575, 577 (S.D. 1981)).

Here, defendants ignored their trust relationship with these students' parents by failing to alert them of the alleged transgressions taking place in defendant Weisenburger's classroom and elsewhere.  Through no meaningful policy in place on how to work with these disabled children and assess when restraint and seclusion may be appropriate, seemingly minimal oversight of defendant Weisenburger's classroom, and what appears to be half-hearted investigations into the conduct when reported to leadership, the supervisor defendants breached their "affirmative duty to disclose," where "mere silence" can constitute fraudulent concealment.  Id.  To the extent defendants claim they were not aware of what was taking place in defendant Weisenburger's classroom, they should have known through meaningful oversight.  Particular oversight is required when it is known or should be known that the pupil is non-verbal or mentally challenged.

14

Janet Doe, mother of D.D., affirms she was not made fully aware of what was taking place in defendant Weisenburger's classroom until she was apprised through local news.  Jane Doe affidavit, Doc. 99 at 3.[3]  Local Aberdeen press first reported on this lawsuit in early January 2019.  See, e.g., Shannon Marvel, Parents Sue School District Claiming Physical, Emotional Abuse of Children with Disabilities, ABERDEEN AM. NEWS (Jan. 2, 2019), https://www.aberdeennews.com/story/news/education/2019/01/02/parents-sue-school-district-claiming-physical-emotional-abuse-of-children-with-disabilities/44311313/.  D.D. and D.D.'s mother joined this lawsuit on March 23, 2020.  Finding the statute of limitations tolled for D.D. due to defendants' fraudulent concealment, D.D.'s claims under the ADA and Rehabilitation Act may proceed.

E.E.'s mother, Julie Doe, was made aware of the OCR complaint against ASD on May 10, 2017.  Julie Doe affidavit, Doc. 100 at 1.[4]  But when Julie Doe reached out to defendants Guffin and Rausch, she was told her child was "not involved [in the alleged transgressions that led to the complaint] and that they would contact [her] if there was a concern."  Id. at 1–2.  Subsequently, Julie Doe was incorrectly told that E.E. was "not involved in the OCR complaint."  Id. at 2.  Yet again, in May 2018, defendants Guffin and Rausch "assured [Julie Doe] that nothing was going on, the matter did not involve E.E. and [she] had no reason to be concerned."  Id.  Only when A.A., B.B. and C.C.s' complaint was filed was she able to discern that E.E. *was* one of the students involved.  Id.  Julie Doe also "immediately called Janet Doe because [she] recognized her son [D.D.] from the complaint."  Id.  Like D.D., E.E. and Julie Doe joined this lawsuit on March 23, 2020.  Like D.D.'s statutory claims, the Court finds the statute of limitations tolled for E.E. due to defendants' fraudulent concealment.

## E.  Municipal Liability under 42 U.S.C. § 1983

Municipalities are not liable under Section 1983 "solely because it employs a tortfeasor."  Bolderson v. City of Wentzville, Missouri, 840 F.3d 982, 985 (8th Cir. 2016)

---

[3] This document was filed under seal, perhaps because of plaintiffs' failure to properly block out all named references to minor children.
[4] This document was subsequently sealed due to a failure to block out a minor plaintiff's name.

(*citing* Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)).  Instead, "[l]iability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee."  Id. (*citing* Atkinson v. City of Mountain View, 709 F.d 1201, 1214 (8th Cir. 2013)).  Plaintiffs argue that ASD itself is liable (1) because of an unofficial custom of tolerating abuse towards special needs students through its teacher, defendant Weisenburger, and education aides engaging in allegedly unconstitutional actions while other staff members failed to take corrective actions, and (2) ASD's alleged failure to adequately train and supervise its employees. Each contention will be discussed in turn.

### 1. *Unofficial Agency Custom*

While a municipal policy is a "'deliberate choice to follow a course of action,'" custom is less rigidly defined.  Jane Doe A v. Special Sch. Dist. of St. Louis Cty, 901 F.2d 642, 645 (8th Cir. 1990) (*quoting* Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986)).  Instead, custom relates to a "pattern of 'persistent and widespread' unconstitutional practices which become so 'permanent and well settled' as to have the effect and force of law."  Id. at 646 (*quoting* Monell, 436 U.S. at 691).  The United States Court of Appeals for the Eighth Circuit has further defined what constitutes a valid claim for municipal liability towards a school district stemming from the alleged transgressions of a teacher constituting an unofficial custom: (1) "[t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) [d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) [t]hat plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation."  Id.; see also P.H. v. Sch. Dist. of Kansas City, Missouri, 265 F.3d 653, 658–60 (8th Cir. 2001).

To satisfy the first prong concerning widespread and persistent pattern of unconstitutional misconduct by ASD's employees, the unconstitutional practices must be

"so 'permanent and well settled' as to have the effect and force of law.'" Id. (*quoting* Monell, 436 U.S. at 691). To be "permanent and well settled," there must be sufficient notice of the alleged pattern of unconstitutional actions to the government so that it is sufficiently apprised of the alleged malfeasance that has taken place which is likely to continue. Without such notice through complaints by the allegedly aggrieved, it would be impossible for a governmental entity to exercise deliberate indifference over misconduct by its employees.

The Eighth Circuit has mandated a high bar for such notice within the school context. See id. (holding there was not adequate notice to satisfy a persistent pattern of unconstitutional actions even when the school district received complaints over two years that a bus driver used foul language, physically restrained and assaulted children, kissed and kicked one of the children, placed his hands down a boy's pants and spanked him, pushed a child down bus steps and pulled his hair, and touched boys' crotches); see also Thelma D. v. Bd. of Educ. of City of St. Louis, 934 F.2d 929, 932–34 (8th Cir. 1991) (finding no pattern of persistent misconduct when school district received complaints of five instances of complaints against the same teacher for sexual abuse spread out over 16 years); see also Tirado v. City of Minneapolis, 2021 WL 679261 at *5–7 (D. Minn.) (*unpublished*) (discussing precedent finding insufficient indicia of pattern with notice of eleven and fifteen prior incidents in school and non-school related contexts across the Eighth and Fifth Circuits). I must follow such precedents.

While defendant Kaul, defendant Weisenburger's supervisor, was made aware of the alleged misconduct of Weisenburger, there was not sufficient notice of complaints to constitute a "pattern of unconstitutional behavior." Between April 2015 and February 2016 Kaul received three emails concerning alleged misconduct by Weisenburger and her teaching aides and was also apprised of several concerns by parents of the children under Weisenburger's supervision. Issues of concern that were raised with Kaul include reports of children being thrown into pools, grabbing the arms of children and jerking them around, yelling and shouting at children, tying a child to a chair, and discussing a student's genitalia with other staff members, among other troubling actions.

17

As disturbing as these alleged allegations in these complaints delivered to defendant Kaul were, they are not sufficient to establish the needed notice to school officials for satisfying a "persistent pattern of unconstitutional behavior" required to instill liability for an unofficial custom. Jane Doe A v. Special Sch. Dist. of St. Louis Cty, 901 F.2d 642, 646 (8th Cir. 1990) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)). In *Jane Doe*, despite repeated distressing allegations of misconduct over two years towards children, including grabbing boys' crotches and kissing a child, the Court of Appeals held there was an insufficient showing of a "permanent and well settled" set of complaints to rise to the high bar of an unofficial custom. Id. Similarly, the several instances here of complaints delivered to Kaul between Spring 2015 and early 2016 are fewer than those in *Jane Doe* and likewise fail to show a persistent pattern of unconstitutional misconduct within the school context.

While common sense may command the logical conclusion that such repeated complaints concerning governmental employees endangering the safety of children would meet the threshold for a persistent pattern of unconstitutional actions, this Court is bound by Circuit authority.

Without school officials receiving adequate notice of an alleged "pattern of unconstitutional behavior," the school district "cannot be said to have shown deliberate indifference towards" an employee's unconstitutional malfeasance. Thelma D. v. Bd of Educ. of City of St. Louis, 934 F.2d 929, 933–34 (8th Cir. 1991). "Notice is the touchstone of deliberate indifference in the context of Section 1983 municipal liability." Atkinson v. City of Mountain View, Missouri, 709 F.3d 1201, 1216 (8th Cir. 2013). But if plaintiffs could make a showing of such a pattern of unconstitutional actions that officials had notice of, deliberate indifference is separately a "'rigorous . . . standard of fault'" that must be found. Id. (quoting Szabla v. City of Brooklyn Park, Minnesota, 486 F.3d 385, 395 (8th Cir. 2007)). A school district cannot "be said to have acquiesced in something of which they had no knowledge." Thelma D., 934 F.2d at 935.

Bound by the high bar to satisfy sufficient notice of a persistent pattern of unconstitutional conduct laid out in Circuit authority, which is not met, this Court cannot hold there was a pattern of deliberate indifference.

Similarly, without evidence of a "custom" that tolerated unconstitutional actions by municipal officials, plaintiffs "likewise cannot establish that [they were] injured by any such custom." S.J. v. Kansas City Missouri Public School Dist., 294 F.3d 1025, 1029 (8th Cir. 2002).

Because the several complaints sent via email to defendant Kaul and concerns raised by parents to ASD personnel do not rise to the high bar of sufficient notice for a persistent pattern of unconstitutional conduct required, ASD itself cannot be found liable under Monell's theory of unofficial custom liability for tolerating any alleged abuse towards special needs students through its teacher Weisenburger and education aides while other staff members failed to take corrective actions.

## 2. *Failure to Train*

Plaintiffs also contend that ASD is itself liable under a failure to train theory of municipal liability, as laid out in City of Canton v. Harris, 489 U.S. 378 (1989). Defendants in turn offer the law on failure to train theories of liability, yet do not venture beyond recital of the elements to make any rebuttal on *why* ASD itself should *not* be held liable under such a claim. Nevertheless, the Court will explain why ASD is susceptible to possible liability under such a theory of liability under Canton.

Municipal agencies may be found liable for a failure to train under § 1983 "where the failure to train amounts to *deliberate indifference* to the rights of persons with whom [the agency] came into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989) (emphasis added). The plaintiffs must "establish that [ASD] had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." Thelma D. v. Bd of Educ. of City of St. Louis, 934 F.2d 929, 934 (8th Cir. 1991). See also Canton, 489 U.S. at 396 (O'Connor, J., concurring in part and dissenting in part); Larkin v. St. Louis Hous. Auth. Dev. Corp., 355 F.3d 1114, 1117–18 (8th Cir. 2004).

However, the Supreme Court has made clear that such a theory of "municipal" liability may only apply in "limited circumstances." Canton, 489 U.S. at 387 (Majority Opinion).  To do otherwise would be to "go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities," which was firmly rejected by the United States Supreme Court in Monell.  Id. at 392.  Further, "[i]t would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs.  This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism." Id.

The requisite showing of deliberate indifference through sufficient notice may be implied through two separate avenues: (1) "where failure to train . . . employees is so likely to result in a violation of constitutional rights that the need for training is patently obvious;" *or* (2) "where the need for additional training may not be obvious from the outset, but a pattern of constitutional violations could put the municipality on notice that its employees' responses to a regularly recurring situation are insufficient to protect the constitutional rights of its citizens." Thelma D., 929 F.2d at 934 (*citing* id. at 390 & n.10, 397).  This requires a showing that ASD "had either actual or constructive notice of the inadequacy of its training program and failed to take remedial steps." Id. at 935.  The analysis under the second prong for a requisite pattern of constitutional violations follows the same high bar demanded by precedent under the analogous § 1983 claim derived from an unofficial custom on the part of a municipal agency.  See S.J. v. Kansas City Missouri Pub. Sch. Dist., 294 F.3d 1025, 1029 (8th Cir. 2002) (adopting same analysis for discerning a sufficient pattern of constitutional violations for requisite notice under an unofficial custom claim for a failure to train allegation).

Finally, there must be causation from the (1) lack of requisite training or (2) clear pattern of unconstitutional conduct to the alleged harm at hand.  This deficiency "must be closely related to the ultimate injury" such that "the deficiency in training actually caused" such offending conduct. Andrews v. Fowler, 98 F.3d 1069, 1077 (8th Cir. 1996) (*quoting* Canton, 489 U.S. at 391). Canton provides guidance on issues of causation:

"[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? Predicting how a hypothetically well-trained [teacher] would have acted under the circumstances may not be an easy task for the factfinder, particularly since matters of judgment may be involved, and since [teachers] who are well trained are not free from error and perhaps might react very much like the untrained [teacher] in similar circumstances. But judge and jury, doing their respective jobs, will be adequate to the task." Canton, 489 U.S. at 391.

The Court will begin its brief analysis of the second prong of Canton before delving into the first path to governmental liability.

This Court has already laid bare why there was not sufficient notice offered to defendant Kaul and ASD leadership to warrant a finding of an adequate pattern of unconstitutional conduct. See *supra* II.E.1. Because of this, plaintiffs cannot make a warranted claim of governmental liability against ASD under the second prong of Canton. See S.J., 294 F.3d at 1029.

However, plaintiffs *do* put forward sufficient grounds for municipal liability under the first channel of liability under Canton due to the school district's failure to have a uniform and disseminated policy towards restraint and seclusion of children, particularly those teachers and aides working within the special education atmosphere. To survive summary judgment, the non-moving plaintiffs must show that the failure to train staff on a clearly defined policy surrounding restraint and seclusion was "so likely to result in a violation of constitutional rights that the need for training is patently obvious." See Thelma D., 929 F.2d at 934 (explaining how lack of training in Canton for police officers on deadly force was "'so obvious, that failure to do so could properly be characterized as 'deliberate indifference to constitutional rights.'" Id. (*quoting* Canton, 489 U.S. at 390 n.10.). Like Canton's failure to provided "patently obvious" training on the use of deadly force when apprehending a felon, ASD failed to put forth a clearly defined policy on restraint and seclusion to its staff. Id. (*citing* Canton, 489 U.S. at 390 & n.10).

The Court does not rest on its own assessment of ASD's policies, or lack thereof, but on the joint investigation of the United States Attorney for the District of South Dakota,

21

the U.S. Department of Justice, and the United States Department of Education, Office of Civil Rights.  See OCR Report, Doc. 114-28.  The OCR Report is clear: "ASD did *not* have a district-wide policy regarding the appropriate use of restraint and seclusion." Id. at 482 (emphasis added).  Instead of uniform understanding of when to use such drastic measures against students, the OCR Report highlighted how "schools throughout the District utilized different reporting mechanisms, and various school personnel had conflicting opinions regarding when and how to utilize restraint and seclusion." Id.

Next, the deficiency in having a restraint and seclusion policy "must be closely related to the ultimate injury," in other words, that "the deficiency in training actually caused" the alleged conduct against plaintiffs.  Andrews v. Fowler, 98 F.3d 1069, 1077 (8th Cir. 1996) (*quoting* Canton, 489 U.S. at 391).  While forecasting "how a hypothetically well-trained [teacher] would have acted" in these incidents is no easy feat for the factfinder, the "judge and jury, doing their respective jobs, will be adequate to the task." Canton, 489 U.S. at 391.  Resolving material facts in favor of the non-movants, the Court finds adequate causation to withstand summary judgment.

These allegations are as troubling as a police department failing to train its officers on deadly force when apprehending felons.  See id. at 390 n.10 ("[T]he need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.").  Looking at the evidence before the Court in the light most favorable to the non-moving party, this failure to provide a policy on restraint and seclusion goes beyond mere, or even gross, negligence, but instead shows deliberate indifference to the constitutional rights of the plaintiff students.

This Court has not engaged in an "endless exercise of second-guessing municipal employee-training programs." Id. at 392.  Rather, there is no policy to second-guess. See OCR Report, Doc. 114-28.  Because there is a failure to provide such needed clearly defined and uniform policies across ASD, defendant ASD can face liability under a failure to train theory for plaintiffs' § 1983 claims.

22

## F. Plaintiffs' § 1983 Claims Pertaining to Alleged Violations under Fourth and Fourteenth Amendments

### 1. *Plaintiffs' Claims Against Named Defendants Individually and in Official Capacity is Redundant*

Plaintiffs have charged the individually named defendants in both their official and individual capacities.  However, claims against a municipal officials in their official capacity are analogous to suit against the municipal agency itself.  See Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  Id. (*citing* Brandon v. Holt, 469 U.S. 464, 471– 72 (1985)); see also Nelson v. Croymans, 2021 WL 3409098 at *3 (D.S.D.) (*unpublished*).  The allegations against the named defendants in their "official capacities" as well as against the school district itself are redundant and should be dismissed.

### 2. *Supervisory Individual Liability*

Plaintiffs briefly bring before the Court a claim under § 1983 against supervisory defendants Guffin, Kaul, Neubert, Rausch, and Murley in their individual capacities for allegedly failing to properly supervise the offending employees, including defendant Weisenburger.  The non-movants appear to allege, without significant substantiation, that the supervisors were on notice and acted with deliberate indifference towards the conduct that was taking place in defendant Weisenburger's classroom, oversights that proximately caused the alleged constitutional violations.  In turn, defendants argue – if there was in fact a purported constitutional violation – that there was not sufficient notice of a pattern of misconduct relayed to the supervisors to warrant individual supervisory liability. Each side's arguments will be taken in turn and scrutinized.

"Supervisory school officials . . . can be liable [in their individual capacities] under § 1983 only if they are 'deliberately indifferent to acts committed by a teacher that violate a student's constitutional rights.'"  Doe v. Flaherty, 623 F.3d 577, 584 (8th Cir. 2010) (*quoting* Doe v. Gooden, 214 F.3d 952, 955 (8th Cir. 2000)).  Here, "the plaintiffs must prove that [the supervisory defendants] had notice of a pattern of unconstitutional

acts, . . . that [they] showed deliberate indifference to th[ose] acts, that [they] failed to take sufficient remedial action, and that such failure proximately caused injury." Id. (*citing* Jane Doe A v. Special Sch. Dist. of St. Louis County, 901 F.2d 642, 645 (8th Cir. 1990)). Courts are reminded that they are to "'refrain from second-guessing the disciplinary decisions made by school administrators.'" Doe v. Dardanelle Sch. Dist., 928 F.3d 722, 725 (8th Cir. 2019) (*quoting* Davis v. Monroe Cty. Bd. Of Educ., 526 U.S. 629, 645 (1999)). The first two elements, notice and deliberate indifference, warrant further discussion.

   The United States Court of Appeals for the Eighth Circuit has recently analyzed the high bar required for actual notice within the supervisory school context, albeit within the ambit of sexual abuse. See KD v. Douglas Cty. Sch. Dist. No. 001, 1 F.4th 591, 597– 99 (8th Cir. 2021). In KD, the Court held that the "actual notice standard is quite onerous." See id. at 598 (holding notice of "favoritism towards the student; inordinate time spent with the student; unprofessional conduct towards the student; and vague complaints about the teacher's behavior toward the student (which do not *expressly* allege[] sexual abuse of that student) fall short of creating actual notice.") (emphasis and alterations in original).

   Here, analogous to the lack of sufficient pattern when determining municipal liability, *supra* II.E.1., there was not sufficient notice provided to any of the supervisory defendants, Kaul or otherwise. The standard for actual notice is "quite onerous," and cannot be satisfied by a few emails or raised concerns by parents. Putting aside the troubling substance of these emails and conversations, the requisite sufficiency of notice has not been met. See KD at 597–99. While there is not sufficient notice, the Court will explain why there is also insufficient indicia of deliberate indifference on the part of the supervisory defendants.

   In the supervisory context, like in the Court's analysis above for analyzing municipal liability, *supra*, deliberate indifference is a "'stringent standard of fault' . . . that cannot be predicated upon mere negligence." Doe v. Flaherty, 623 F.3d 577, 584 (8th Cir. 2010) (*quoting* Shrum v. Kluck, 249 F.3d 773, 780 (8th Cir. 2001)). Deliberate

24

indifference "requires proof of *reckless disregard* of a risk of constitutional harm." Cox v. Sugg, 484 F.3d 1062, 1066 (8th Cir. 2007) (emphasis in original) (*citing* Pietrafeso v. Lawrence Cty., 452 F.3d 978, 982–83 (8th Cir. 2006)). See also L.L. Nelson Enter., Inc. v. Cty. of St. Louis, Missouri, 673 F.3d 799, 810 (8th Cir. 2010) (holding that under Ashcroft v. Iqbal, 556 U.S. 662, 675–76 (2009) "the plaintiff must plead that the supervising official, through his own individual actions, has violated the Constitution . . . [and] the alleged constitutional violation requires proof of an impermissible motive . . . that the defendant acted with such impermissible purpose, not merely that he knew of a subordinate's motive.").

Even if supervisory defendants did have sufficient notice from the emails and raised concerns, the high bar required for a showing of deliberate indifference has not been met. While defendant Kaul may have been negligent, even grossly negligent, in her responses to the allegations about the conduct in defendant Weisenburger's classroom, individual liability under a supervisory theory requires a higher bar "of *reckless disregard* of a risk of constitutional harm." Cox, 484 F.3d at 1066 (emphasis in original). The actions of defendant Kaul and other supervisor defendants may fall short of what common sense would command with the several instances of concerns allayed, but these supervisors' lack of further action before the resignation of defendant Weisenburger does not meet the threshold for individual supervisory liability. To reiterate, this showing of deliberate indifference – to instill individual supervisory liability – is different than the appropriate analysis for ASD itself to be deliberately indifferent in its failure to install uniform policies within its schools for proper use of restraint and seclusion.

The non-movants fail to go beyond conclusory statements about supervisory defendants not acting within the confines of "their professional standards." Doc. 136 at 22. Section 1983 supervisory liability requires more than brief assertions and recitals of case law. Even in the light most favorable to plaintiffs, the individually named supervisory defendants cannot be susceptible to liability under a failure to supervise.

### 3. *Fourth Amendment Seizure Claims*

Defendants move for summary judgment on plaintiffs' Fourth Amendment seizure claims against defendants ASD, Guffin, Neubert, Kaul, and Weisenburger, arguing the acts to control the disabled students were not unreasonable and not substantial departures from the professional standards expected of them. Plaintiffs contend the instances of alleged physical seizure – including dragging children into a pool and secluding them in a small windowless room on countless occasions – by defendants without an identified educational purpose, and their deviation from professional norms, do constitute genuine issues of material fact that withstand summary judgment.

The United States Supreme Court has "made clear that students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate.'" Mahanoy Area Sch. Dist. v. B.L., ___ U.S. ___, 141 S.Ct. 2038, 2044 (2021) (*quoting* Tinker v. Des Moines Indep. Sch. Dist., 393 U.S. 503, 506 (1969)). A disabled student presents a cognizable Fourth Amendment seizure claim when a schoolteacher or teacher's aide (1) seizes the student, and (2) that seizure was unreasonable. C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347, 591 F.3d 624, 633 (8th Cir. 2010). Because defendants do not argue why the incidents against A.A., B.B., and C.C. would *not* constitute a seizure, the Court assumes without deciding there was a sufficient seizure against the students and proceeds to the second prong of the Fourth Amendment analysis.[5]

Reasonableness is assessed in light of the "totality of the circumstances." Id. When judging the reasonableness of the circumstances, "[c]ontext is [therefore] critical." Id. (alterations in original) (*quoting* Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d 1243, 1251 (10th Cir. 2008)). Within the school setting, "the Fourth Amendment's reasonableness inquiry . . . must account for 'the schools' custodial and tutelary responsibility' over the students entrusted to their care.'" Shade v. City of

---

[5] Defendants begin their arguments by "assuming, arguendo, such conduct would constitute a restraint within the meaning of the Fourth Amendment," without explaining *why* the allegations would *not* be a seizure. DEFENDANTS' BRIEFS FOR SUMMARY JUDGMENT, Docs. 76 at 13; 79 at 12; 82 at 11. Thus, the Court assumes without deciding that there were seizures of the students.

Farmington, Minnesota, 309 F.3d 1054, 1059 (8th Cir. 2002) (*quoting* Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 656 (1995)).  When assessing Fourth Amendment claims pertaining to disabled persons, the United States Court of Appeals for the Eighth Circuit instructs courts to look to whether authorized professionals pursued "'a *substantial departure* from accepted professional judgment, practice, or standards.'" C.N., 591 F.3d at 633 (emphasis in original) (*quoting* Heidemann v. Rother, 84 F.3d 1021, 1030 (8th Cir. 1996)).  See also id. (holding educators would be "in a very difficult position if we did not allow them 'to rely on a [IEP] specifically approved by the student's parents and which they are statutorily required to follow.'"  Couture, 535 F.3d at 1252).  But see A.C. v. Indep. Sch. Dist. No. 152, 2007 WL 1544507 at *5–6 (D. Minn.) (*unpublished*) (holding seclusion of disabled child in small windowless room *beyond* what was laid out in IEP *does* generate genuine issues of material fact for unreasonableness); K.G. v. Sergeant Bluff-Luton Comm. Sch. Dist., 244. F.Supp.3d 904, 926 (N.D. Iowa 2017) (finding defendants committed a "substantial departure" from the "accepted professional judgment, practice, or standards" when the IEP provided "no authorization for the use of force to grab [plaintiff's] ankles to move him to the 'chill out zone,' or, indeed, any other specific authorization for the use of force as a means to obtain his compliance.").

Because the Court must assess the plaintiffs' Fourth Amendment claims separately, the claims for A.A., B.B., and C.C. are each analyzed in turn.

Before the Court can properly discuss the merits of the three plaintiffs' claims, a brief overview of restraint and seclusion policies is required.  The United States Department of Education's Civil Rights Data Collection ("CRDC") defines "physical restraint" as "[a] personal restriction that immobilizes or reduces the ability of a student to move his or her torso, arms, legs, or head freely."  U.S. DEP'T OF EDUC., Restraint and Seclusion: Resource Document 10 (2012) (available at https://www2.ed.gov/policy/ seclusion/restraint-and-seclusion-resource-document.html).  Further, the CRDC defines "seclusion" as "[t]he involuntary confinement of a student alone in a room or area from which the student is physically prevented from leaving."  Id.  These measures are not to

be used lightly: the Department urges school officials to only use these practices "where the child's behavior poses imminent danger of serious physical harm to self or others and other interventions are ineffective and should be discontinued as soon as imminent danger of serious physical harm to self or others has dissipated." Id. at 12.  These measures are "never [to] be used as punishment or discipline . . . [or] as a means of coercion or retaliation, or as a convenience." Id.  To do otherwise would be inconsistent with "the child's rights to be treated with dignity and to be free from abuse." Id.  To ensure the proper usage of such techniques, "[p]olicies regarding the use of restraint and seclusion should be reviewed regularly and updated as appropriate." Id.  As previously discussed, *supra*, ASD did not have any uniform policy on restraint and seclusion at the time of plaintiffs' allegations. OCR Report, Doc. 114-28.

First, depositions and exhibits offered by plaintiffs bring forward several facts common to all three children.  While given many names, the small windowless room that would contain either one table and a few chairs or nothing at all, would often be used as punishment for the students. See Doc. 114-27 at 2, Exhibit 27.  Disabled students could be left in the seclusion area for an entire afternoon at a time, Weixel transcript, Doc. 104-9 at 52–53, despite defendant Kaul's own admission that children are only to be restrained as a last resort when they are at risk of harming themselves or others.  Kaul transcript, Doc. 104-3 at 19.  These children could not leave the "little room" without completing assigned tasks, immaterial to concerns of dangers to the students or staff. See Bellefeuille transcript, Doc. 104-1 at 26 (explaining children could not leave the room unless they finished their tasks).  This was done towards all the disabled children at the school. Id. at 33.  Even when children were not a danger to themselves or others, an ASD staff member stated children would be placed into "basket holds," where a staff member would go behind the student and put their arms around them, as if they were being hugged from behind to control them.  Weixel transcript, Doc. 104-9 at 39.  A staff member also reported that defendant Weisenberger would "grab children by the chin and say, '[l]ook at me when I'm talking to you.'" Id. at 49–50.  Because defendant Kaul, who was in charge of investigating allegations surrounding improper restraint and seclusion,

did not keep documentation of much of her purported investigations – which defendant Guffin acknowledges is problematic –, further evidence becomes difficult to ascertain. Kaul transcript, Doc. 104-3 at 131–32; Guffin transcript, Doc. 104-2 at 52.

Specific allegations have been made concerning A.A. A.A. was reported to be forced into seclusion for failing to follow directions, despite no evidence A.A. was a danger to herself or anybody else. Doc. 114-7, Exhibit 7. A.A. was to stay in seclusion when acting out and could only leave the little room when she would finish her tasks, not based on whether she was a danger. Id. A.A. could be sent to the seclusion room for as little as not properly hanging up her coat and either trying to run around or pushing the cabinet. Id. She would also be forced to wear gloves to avoid clapping in class. Weixel transcript, Doc. 104-9 at 61. Incredulously, defendant Neubert saw no problem with the assertion that A.A. was placed in the secluded room 274 times in a six-month time frame from October 2015 to March 2016. Neubert transcript, Doc. 104-7 at 51.

B.B. also presents the Court with instances of specific conduct. B.B. was reported by ASD staff to have been forced against his will into the swimming pool. Weixel transcript, Doc. 104-9 at 46. Defying common sense when interacting with a non-verbal autistic child, the teacher's aide Ms. Weixel discussed how B.B. would be "pushed . . . into the pool," and when he would try to "hang onto the wall, [defendant Weisenburger] kept acting like she was going to step on his fingers." Id. Unfortunately, pushing children into the pool apparently occurred with some frequency. Id. Defendant Guffin acknowledges that dragging children by their wrists into swimming pools would constitute physical abuse. Guffin transcript, Doc. 104-2 at 75–76. Further, B.B. would be dragged into the seclusion room for resisting going to gym class, despite no reports that there were concerns of B.B. being a danger to himself or others. Weixel transcript, Doc. 104-9 at 59–60.

Finally, C.C. reports specific instances of misconduct directed towards him by defendants. A staff member reported that defendant Weisenburger forcibly stripped C.C. and was prepared to push him into the pool. Weixel transcript, Doc. 104-9 at 42–44. C.C. resisted so vigorously and yelling so loudly when being stripped that a concerned

witness came into the locker room to see what was taking place; when he looked at defendant Weisenburger on top of C.C. "his eyes got huge." Id. Despite being obligated under professional responsibilities and standards to report such conduct to C.C.'s parents, no communication appeared to take place. Guffin transcript, Doc. 104-2 at 91. On another occasion, even though he was in pain from his "blocked tubes," C.C. was also forced to ride a horse against his will, which he responded to with kicking and screaming. Weixel May 2015 letter, Doc. 114-2 at 1.

Here, all three plaintiffs successfully make allegations that rise to the threshold for Fourth Amendment claims to withstand summary judgment. Turning aside the question of whether there were proper seizures, as it was not properly argued by defendants, the Court finds the actions of defendants described above were very likely unreasonable and a substantial departure from professional standards. Within the context of working with disabled children, including those who are non-verbal, and accounting for ASD's custodial and tutelary responsibility, the actions of the defendants taken in the light most favorable to plaintiffs may well stray far from any standard required for special education teachers and aides. None of the three children's IEPs, except for a handwritten note that appears on A.A.'s, indicate usage of the seclusion room for instances where the children are not dangers to themselves or others. See Behavior Intervention Plans, Docs. 114-16–18, Exhibits 16–18. And even for A.A.'s IEP, there is no discussion of such frequent use of the little room that she would be in the windowless space over 270 times in six months.

While not all usage of the seclusion room may be an unreasonable seizure, the overwhelming uses of the room for minor infractions unrelated to imminent harm do, at a minimum, constitute genuine issues of material fact. See A.C. v. Indep. Sch. Dist. No. 152, 2007 WL 1544507 at *6 (D. Minn.) (unpublished) (noting "[i]t is true that not all instruction in [seclusion room] would or could constitute an unlawful seizure," but the overwhelming use of it did generate "genuine issues of material fact concerning under what conditions and for how long [plaintiff] was placed in [the room]."). Additionally, none of the IEPs discuss permitting staff to drag children against their will into pools,

30

forcibly strip them in locker rooms, or pursue restraint measures when there were no indicia of a present danger to the students or to others, despite the Department of Education's warnings on using restraint or seclusion without "imminent danger of serious physical harm." U.S. DEP'T OF EDUC., Restraint and Seclusion: Resource Document 12 (2012) (available at https://www2.ed.gov/policy/seclusion/restraint-and-seclusion-resource-document.html).

Defendants remind the Court that it is "cautioned not to substitute our 'own notions of sound educational policy for those of the school authorities which [we] review.'" J.B. v. Avilla R-XIII Sch. Dist., 721 F.3d 588, 594 (8th Cir. 2013) (alteration in original) (*quoting* Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 205–06 (1982) (superseded by statute on other grounds)). That is a valid concern. But because ASD had no clear, uniform policy on restraint and seclusion, staff going far beyond what was permitted in plaintiffs' IEPs, and defendants having appeared to substantially depart from accepted professional practices for restraining and secluding students with disabilities for more than imminent danger of harm, genuine issues of material fact remain. Accordingly, plaintiffs' Fourth Amendment seizure claims may proceed for analysis under qualified immunity.

### 4. *Parental Due Process Claims Under Fourteenth Amendment*

The parent plaintiffs have alleged vague claims of defendants violating their parental due process rights without *citing* authority within the Eighth Circuit, namely through inhibitions in their ability to control their children's education. Defendants in turn point to Eighth Circuit analysis of such parental due process claims, arguing there must be *intentionally directed* interference with the parent-child relationship, and if parent plaintiffs are in fact alleging a loss in association then they must claim there was a *permanent* physical loss of the parent-child relationship. Construing the claims in the light most favorable to the non-moving parent plaintiffs, the Court assumes the plaintiffs are not putting forth a loss of association claim under the due process clause, but instead through their alleged inability to control their children's education.

31

While the Eighth Circuit has not fully settled the question of what constitutes a §
1983 claim based on *parents*' due process rights, it has cited favorably to an out of circuit
analysis requiring the allegedly aggrieved party to demonstrate that the State action was
aimed *directly* at the parent-child relationship.  In Harpole v. Arkansas Department of
Human Services, the Circuit Court discussed approvingly the First Circuit's analysis in
Ortiz v. Burgos of parental due process claims falling into two categories.  See Harpole v.
Arkansas Dep't of Human Serv., 820 F.2d 923, 927–28 (8th Cir. 1987) (*citing* Ortiz v.
Burgos, 807 F.2d 6, 8–9 (1st Cir. 1986)).  First, there are those claims related to "private
decisions affecting the family, such as whether to bear children."  Id. at 927.  And
relevant to plaintiffs' case are those circumstances "dealing with governmental attempts
to *directly* affect the parent-child relationship."  Id. (emphasis added).

In Harpole, the Court took notice of a lesser level of familial connection between
the plaintiffs and the victim of state action than is the case here, involving a stepfather,
three brothers, and a sister, opposed to legal parents.  Id. at 928.  Nevertheless, regardless
of familial status, Harpole showed reluctance to find liability without a showing of
"direct intent of affecting the parent-child relationship."  See Ellingson v. Piercy, 2016
WL 2745868 at *9 (W.D. Mo.) (*unpublished*) (analyzing Eighth Circuit's holding in
Harpole).  A sister district court tackling this question has held that, in light of Harpole,
"inclusive of its favorable discussion of Ortiz, . . . the Eighth Circuit has joined with the
Fourth, First, and Sixth Circuits, in requiring a parent . . . to demonstrate that the State
action was aimed directly at the parent-child relationship."  Helleloid v. Indep. Sch. Dist.
No. 361, 141 F.Supp.2d 863, 874 (D. Minn. 2001).  Because plaintiffs have not refuted
the Eighth Circuit precedent requiring a direct intent at affecting the parent-child
relationship, the Court assumes without deciding that the analysis laid out under the First
Circuit's opinion in Ortiz is the applicable law for parental due process claims.

Here, there is absolutely no evidence in the record that defendants acted
*intentionally* at harming the parent-child relationship of parents to A.A., B.B., and C.C.
While there may be other actionable § 1983 claims, there is no merit to plaintiffs'
allegations of harm to their parental due process rights.  The Eighth Circuit has held that,

32

under federal law, "[p]rotecting familial relationships does not necessarily entail compensating relatives who suffer a loss as a result of wrongful state conduct, especially when the loss is an indirect result of that conduct." Harpole, 820 F.2d at 928. Accordingly, plaintiffs' parental due process claims should be dismissed.

### 5. *Students' Substantive Due Process Claims Under Fourteenth Amendment*

Defendants also ask the Court to dismiss plaintiffs' substantive due process claims, arguing the evidence in the record does not rise to the high bar necessary to "shock[] the contemporary conscience." C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347, 591 F.3d 624, 634 (8th Cir. 2010) (internal quotations omitted). Plaintiffs argue the alleged abuse directed at A.A., B.B., and C.C. has generated a genuine dispute of material fact as to be conscience shocking when the disabled students have been stripped against their will, dragged into the seclusion room, forced into pools, and a host of repeated instances of putting the children into the seclusion room far beyond the scope advised by the Department of Education, among other allegations. Defendants dispute there can be "conscience shocking" § 1983 claims without more than de minimis physical injury to the specific plaintiffs and that any alleged psychological harm would be insufficient. All these contentions are discussed in turn.

Plaintiffs' substantive due process claims under the Fourteenth Amendment require "actions by a government official which violated one or more fundamental constitutional rights and were shocking to the contemporary conscience." Id. (internal quotations omitted). This is a "high standard," because "'[s]ubstantive due process is concerned with violations of personal rights . . . so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to brutal and inhumane abuse of official power literally shocking to the conscience.'" Id. (alterations in original) (*quoting* Golden v. Anders, 324 F.3d 650, 652–53 (8th Cir. 2000)).

The first of the two requisite elements, that there is a constitutionally protected liberty interest at stake was not substantively disputed by defendants. Plaintiffs contend there is a protected liberty interest at stake in two ways, namely in the minor students'

bodily integrity and under a state-created danger theory caused by ASD and supervisory defendants.  Because this was not briefed by both parties, the Court assumes without deciding that there is a liberty interest at stake and proceeds to the second prong of a substantive due process claim.  See generally United States v. Turner, 781 F.3d 374, 385 (8th Cir. 2015) (assuming without deciding an issue on appeal when an issue was not challenged by the parties in their briefs, because the Court was "reluctant" to resolve such issues without "adversarial briefing.").  Thus, the Court next turns to the "shocks the conscience standard" for a constitutional violation.

The "shocks the conscience" standard is a far more stringent standard than the "unreasonableness" standard applied for Fourth Amendment claims.  K.G. v. Sergeant Bluff-Luton Comm. Sch. Dist., 244 F.Supp.3d 904, 926 (N.D. Iowa 2017).  Here, "[m]ere negligence is never sufficient."  Terrell v. Larson, 396 F.3d 975, 978 (8th Cir. 2005) (en banc).  The governmental action "must be 'truly irrational' and consist of conduct that is more than merely arbitrary, capricious, or violative of state law."  Golden v. Anders, 324 F.3d 650, 652 (8th Cir. 2003) (quoting Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc).  To succeed, plaintiffs must show either (1) defendants' actions were so beyond the pale as to be "so inspired by malice or sadism rather than a merely careless or unwise excess of zeal" when the state actors did not have the benefit of contemplation but instead were faced with instant decision-making, or (2) deliberate indifference when "actual deliberation is practical."  Truong v. Hassan, 829 F.3d 627, 631 (8th Cir.) (internal quotations omitted).  Because the allegations brought forth by plaintiffs center on repeated instances of how ASD and individual defendants continued to treat plaintiffs as opposed to split-second conduct, the merits of a substantive due process violation are analyzed under the second prong concerning deliberate indifference.

In this context, deliberate indifference "requires that the school's indifference caused the student to be subjected to harassment."  Gullion v. Manson NW. Webster Sch. Dist., 2021 WL 276702 at *14 (N.D. Iowa) (unpublished) (citing K.T. v. Culver-Stockton

Coll., 865 F.3d 1054, 1057 (8th Cir. 2017).[6] It "must either directly cause the abuse to occur or make students vulnerable to such abuse." Shrum v. Kluck, 249 F.3d 773, 783 (8th Cir. 2001). When conducting such an analysis, courts look to "whether the response was 'clearly unreasonable in light of the known circumstances.'" Gullion, 2021 WL 276702 at *15 (quoting Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 648 (1999)). A sister district court looked at factors to assess when discerning deliberate indifference claims within the school context which included: "the time it took the [school] district to respond to complaints, the level of response, the effort expended to respond to the allegations, and the efficacy of the response." Id. The court proceeded to note that "[t]he deliberate indifference standard is often a fact question." Id.

Defendants posit physical acts are required to shock the contemporary conscience, and that verbal abuse does not suffice. While defendants cite to Martin v. Sargent for the proposition that "[v]erbal threats do not constitute a constitutional violation," subsequent precedent has found exceptions to the rule. 780 F.2d 1334, 1339 (8th Cir. 1985). See Irving v Dormire, 519 F.3d 441, 448–49 (8th Cir. 2008) (While "verbal threats are normally insufficient to violate the Constitution . . . We have made an exception, however, when the state official engaged in a 'brutal' and 'wanton act of cruelty' even though no physical harm was suffered.") (abrogated on other grounds) (internal quotations omitted). Unlike in Martin, where the plaintiff was an adult prisoner, here the alleged victims are disabled children, including non-verbal plaintiffs, constituting some of the most vulnerable members of society.

Even for those alleged instances that do not constitute physical conduct, there can still be resulting psychological harm. The Eleventh Circuit has aptly noted that students who "suffer from severe developmental disabilities[] are particularly vulnerable to psychological harm, and that psychological injuries can be as traumatic, if not more traumatic, than physical injuries." T.W. v. Sch. Bd. of Seminole Cty., Florida, 610 F.3d

---

[6] In Gullion, the District Court noted that the "deliberate indifference" analysis was "nearly identical" for substantive due process and Title IX violations and examined them under the same analysis. Gullion, 2021 WL 276702 at *12.

588, 601 (11th Cir. 2010).  The T.W. Court noted there may be cases where transgressions against disabled students with little more than de minimis physical injury cause great psychological harm which "'might be so severe that it would amount to torture equal to or greater than the stomach pumping abuse condemned in [Rochin v. California, 342 U.S. 165 (1952)].'"  Id. at 601–02 (*quoting* Abeyta v. Chama Valley Indep. Sch. Dist., 77 F.3d 1253, 1258 (10th Cir. 1996)).

A Pennsylvania U.S. District Court has also assessed claims under a state-created danger theory for a § 1983 claim brought by a disabled student plaintiff.  See Hamilton v. Spriggle, 965 F.Supp.3d 550, 566–68 (M.D. Pa. 2013).  There, the Court found a genuine issue of material fact when supervisory personnel in the school were made aware of alleged abuse against a non-verbal child with special needs despite the child not "[d]ying, requir[ing] hospitalization, had no bones broken, nor was he out of school for any length of time due to the abuse . . . On the other hand, [plaintiff] is not an able-bodied, mature teenager who could report the abuse to his parent or authorities.  [Plaintiff] was a severely disabled boy who could not speak.  [Plaintiff]'s only verbalization of the abuse was his ability to scream out in pain."  Id. at 567.  The Hamilton Court's analysis is analogous to the disconcerting allegations before this Court.

Here, plaintiffs have put forth sufficient evidence to generate genuine issues of material fact, and like the Court's analysis for the Fourth Amendment claims, each student's merits must be assessed in turn.  These instances put forth by plaintiffs did not result from split-second decision-making, but instead fall under a continued pattern of failing to adhere to the guidance of Education Department reports about restraint and seclusion where actual deliberation was possible.  Much of the evidence that warrants denying defendants' motion for summary judgment on plaintiffs' substantive due process claims has already been discussed by the Court above in its analysis for the applicability of the students' Fourth Amendment claim, *Supra* II.F.3.

First, common to all children are the repeated instances of being forced into the seclusion room, or the "little room," far beyond what was advised by the Department of Education.  See U.S. DEP'T OF EDUC., Restraint and Seclusion: Resource Document

(2012) (available at https://www2.ed.gov/policy/seclusion/restraint-and-seclusion-resource-document.html).

Instead of being used only for imminent threats of physical harm to the students or others, the students would be left in the room for as long as the entire afternoon as punishments for infractions as small as failing to properly hang up a coat and pushing a cabinet. Doc. 103-1 at 12, Exhibit 7.[7] These students could only leave the windowless room when all assigned tasks were completed, instead of the Education Department's guidance on only using the room to avoid imminent harm to students or others. Doc. 114-27 at 2, Exhibit 27; Bellefeuille Transcript, Doc. 104-1 at 26; U.S. DEP'T OF EDUC., Restraint and Seclusion: Resource Document 12 (2012) (available at https://www2.ed.gov/policy/seclusion/restraint-and-seclusion-resource-document.html). Each student's specific claims are discussed for alleged violations of the children's constitutionally protected interest in bodily integrity and for a state-created danger caused by supervisory defendants and ASD's inaction to prevent the alleged misconduct despite warnings.

As previously laid out, *supra*, A.A. endured the small, windowless room an alleged 274 times between October 2015 and March 2016, which defendant Neubert saw as no problem. Neubert transcript, Doc. 104-7 at 51. While A.A. was never dragged or forcibly stripped, it is conscience shocking to imagine a young girl, unable to communicate in succinct fashion to loved ones about the ordeals she suffered, under the care of defendant Weisenburger where minimal oversight appeared to take place. A.A. was simply left in the seclusion room regardless of whether she was not an imminent danger to herself or others. Instead, A.A. would be sent to the room for as little as not hanging up her coat and pushing cabinets. Doc. 103-1 at 12, Exhibit 7. Further, it is immaterial that A.A. does not allege physical injury for her substantive due process claim. As thoughtfully analyzed in T.W. by the Eleventh Circuit, young children with disabilities are "particularly vulnerable to psychological harm, and th[ese] psychological

---

[7] This exhibit was filed under seal with subsequent notice of filing error.

injuries can be as traumatic, if not more traumatic, than physical injuries." T.W. v. Sch. Bd. of Seminole Cty., Florida, 610 F.3d 588, 601 (11th Cir. 2010). The Court can only imagine the harm that can come from being shunned into the windowless room on so many occasions. At the bare minimum, there remain genuine issues of material fact that warrant sending this claim to a jury.

Next, B.B. also has met the high bar for a genuine issue of material fact for a cognizable substantive due process claim. He was forced against his will into a swimming pool and when he would attempt to hang onto the wall to avoid swimming, defendant Weisnburger would act as if she would step on his fingers. Weixel transcript, Doc. 104-9 at 46. ASD's own superintendent, defendant Guffin, acknowledges dragging children into pools constitutes physical abuse. Guffin transcript, Doc. 104-2 at 75–76. Further, B.B. would be confined to the seclusion room without any concerns of his or others' well-being. Whether there was the requisite level of deliberate indifference required for a substantive due process claim is "often a fact question." Gullion v. Manson Nw. Webster Sch. Dist., 2021 WL 276702 at *15 (N.D. Iowa). Here, whether there was indeed conduct that shocked the contemporary conscience belongs within the province of the jury. They will decide this case.

Finally, C.C. has also succeeded in advancing a Fourteenth Amendment substantive due process claim. Here, there were more than de minimis instances of physical misconduct alleged against C.C. Staff reported defendant Weisenburger forcibly stripping C.C. and preparing to push him into the pool. Weixel transcript, Doc. 104-9 at 42–44. A concerned passerby entered the locker room to see what was causing such a commotion when defendant Wiesenburger was forcibly stripping C.C., to the point "his eyes got huge." Id. And this was not the only instance of harm alleged by C.C.: Ms. Weixel reported how C.C. was forced to ride a horse, against his will, while being in pain from his "blocked tubes." Weixel May 2015 letter, Doc. 114-2 at 1.

Two of these three children are non-verbal, and none can effectively communicate about alleged instances of abuse to their parents and loved ones. The evidence before the Court shows a pattern of physical and psychological harm wrought upon these children

by defendant Weisenberger while supervisory defendants failed to put in place policies to protect these vulnerable children from improper use of restraint and seclusion, turned a blind eye to concerns of misconduct by defendant Weisenberger and those aides in her classroom, and failed to properly investigate concerns that were raised. Defendant Kaul acknowledges the risks from improper restraint and seclusion procedures, recognizing when used incorrectly it can lead to physical and emotional harm to the students, as well as even death. Kaul transcript, Doc. 104-3 at 33. But she nevertheless did not appear to take adequate steps to investigate the allegations presented to her by Ms. Weixel.

Further, defendant Neubert did not investigate allegations when they were made aware to him, including that children were "being carried, dragged, or walked to the little room where they were required to complete a task basket in order to leave." Neubert transcript, Doc. 104-7 at 47. Astonishingly, when asked about the appropriateness of sending A.A. to the seclusion room 274 times in a six-month time frame, he did not see any problem with such extreme measures. Id. at 51. Defendant Guffin acknowledges that she was aware of the concerns in Ms. Weixel's "To Whom it may Concern" letter, having had it relayed to her by defendant Kaul, but also asserts she was told the substance of the concerns was not accurate. Guffin transcript, Doc. 104-2 at 73, 49. She also acknowledges that the conduct allayed in the letter would in fact constitute abuse, such as dragging a child by the wrists into a swimming pool. Id. at 75–76.

Our sister district court in Gullion looked to how long it took the school district to respond to complaints that it received, what their response to these complaints was, the steps they took to respond to the allegations, and the efficacy of their conduct in rectifying any allegations brought forward. Gullion v. Manson Nw. Webster Sch. Dist., 2021 WL 276702 at *16 (N.D. Iowa). Here, the Court strains to apply these steps because of how little response was even provided by ASD and supervisory defendants. Simply put, there are genuine issues of material fact that ASD and the supervisory defendants have shocked the contemporary conscience for failing to investigate allegations of abuse against these vulnerable children and to have polices in place surrounding restraint and seclusion to ensure such missteps could not occur.

The District Court for the Middle District of Pennsylvania examined similar claims against supervisory personnel who were made aware of alleged abuse against a non-verbal child.  Despite the fact neither there nor here a child has not "died, required hospitalization, had no bones broken, nor . . . out of school for any length of time due to the abuse," genuine issues of material fact nevertheless remain.  Hamilton v. Spriggle, 965 F.Supp.3d 550, 567 (M.D. Pa. 2013).  Analogous to the teenager in Hamilton, these three children were not mature individuals who could meaningfully report their experiences to loved ones or proper authorities.  Like Hamilton, these children's only "verbalization of the abuse was [their] ability to scream out in pain."  Id.

Because all three students have presented genuine issues of material fact on their substantive due process claims' to have shocked the contemporary conscience, defendants' motion for summary judgment on these claims should be denied.

### 6. *Plaintiffs' Procedural Due Process Claims*

Plaintiffs also bring before the Court procedural due process claims, which appear to be centered around the parents' inability to meaningfully challenge the discipline ordered by defendant Weisenburger that resulted in the repeated use of the seclusion room and other punishments.  However, plaintiffs cite for such proposition that these students were denied adequate procedural due process by the Aberdeen School District Policies and Regulations, see Doc 114-35, Exhibit 35.  In ASD's Policies and Regulations that plaintiffs cite, however, it specifically instructs that, as to special education students who attend a public school on an IEP, school employees are to "consult with a student's [IEP] team to adequately address student disciplinary actions with the provision of a free and appropriate public education for students with disabilities."  Id.

If plaintiffs are in fact protesting the disciplinary measures taken that were not in line with their children's IEPs, then they must pursue the administrative remedies awarded to them under the IDEA.  This Court has already explained that "[i]f the remedy sought is for the denial of a free appropriate public education ("FAPE"), then the IDEA requires exhaustion, regardless of the form of the claims bought by plaintiffs."

40

MEMORANDUM AND ORDER DENYING MOTION TO DISMISS, Doc. 49 at 7.  See also Fry v. Napoleon Comm. Sch., 137 S.Ct. 743, 755 (2017) (explaining that exhaustion under the IDEA is required when "the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way.").  While the § 1983 claims brought by plaintiffs are *not* related to the alleged inadequacy of the students' education but instead centered around improper use of restraints, seclusion, and other alleged inappropriate conduct, *this* claim appears to be tied to a denial of a FAPE. Like in J.M. v. Francis Howell School District, 850 F.3d 944 (8th Cir. 2017), where the plaintiff's allegations centered around the amount of time a disabled student was "in physical restraints" which damaged his ability to "benefit from instruction," plaintiffs' procedural due process claims appear intrinsically tied to not being afforded the opportunity to contest discipline within the school setting.  See J.M. v. Francis Howell Sch. Dist., 850 F.3d 944, 947, 949 (8th Cir. 2017) (internal quotations and ellipses omitted).

Under the United States Supreme Court's ruling in Fry v. Napoleon Community Schools, 137 S.Ct. 743 (2017), courts must ask two questions:

> First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school? Second, could an adult at the school have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject. *But when the answer is no, then the complaint probably does concern a FAPE.*

Fry, 137 S.Ct. at 756 (emphasis added).  Unlike the rest of plaintiffs' § 1983 claims, the answers to these two questions, when assessing the vaguely worded procedural due process claims, is "no."  First, plaintiffs likely could not bring essentially the same claim if this occurred at another public setting, whether it be a public library, pool, or theater: this relates to how teachers discipline – seemingly to an excessive degree – special education students within their classroom.  Second, an adult could not have pressed the same grievance: this relates to the operation of classrooms and how they may improperly have disciplined their most vulnerable students.

Complaints surrounding the improper application of IEPs in relation to gross over-use of disciplinary measures under a procedural due process theory of liability must be exhausted through the IDEA administrative process. Because this has not been done, the Court will grant summary judgment for defendants on plaintiffs' procedural due process claims.

### 7.  *Plaintiffs' Equal Protection Claims*

Defendants move for summary judgment on plaintiffs' equal protection claims, arguing (1) minor plaintiffs should be compared to a similarly treated class of other disabled children within defendant Weisenburger's classroom and (2) the conduct that took place withstands rational basis review. Plaintiffs contend the similarly treated context should be to the entire student body at May Overy, and that they meet their burden under rational basis review for eight separate actions: (1) the students being forced to "arrive and leave early" from the school; (2) "minor plaintiffs were required to enter and exit a door . . . separate from their peers; (3) minor plaintiffs were required to sit together at one table during lunch; (4) minor plaintiffs' recess was in a location and time separate from their peers;" (5) claims that the student plaintiffs were "denied the policies and procedures related to due process and discipline";[8] (6) that "minor plaintiffs were subject to routine and persistent restraint and seclusion; (7) minor plaintiffs were the subjects of physical and verbal abuse," and (8) "plaintiffs A.A. and B.B. were subject to a no-touch policy at Simmons [Middle School]." Doc. 140 at 36. Setting aside the procedural due process claims, each of the other seven are assessed for any genuine issues of material fact.

Because students with disabilities are "'not a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation,'" plaintiffs' equal protection claim is assessed under the rational basis standard of review." Costello v. Mitchell Pub. Sch. Dist. 79, 266 F.3d 916, 921 (8th Cir. 2001) (*quoting* Heidemann v. Rother, 84 F.3d 1021, 1031 (8th Cir. 1996)). Plaintiffs

---

[8] While plaintiffs repeat their procedural due process claim here, the Court has already disposed of this claim for failure to exhaust administrative remedies. See *supra* II.F.6.

"may bring an equal protection claim as a 'class of one' where [they] allege[] 'that [they] ha[ve] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Id. (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam). Under rational basis review, the proponent of the claim bears the burden of asserting there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." See Heller v. Doe, 509 U.S. 312, 319–20 (1993) (holding rational basis review "accord[s] a strong presumption of validity"). See also Gallagher v. City of Clayton, 699 F.3d 1013, 1019 (8th Cir. 2012) (holding, under rational basis review, actions are "upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification'") (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)). This is a high bar to meet. For example, defendants' actions could be unreasonable under the Fourth Amendment yet not be irrational under rational basis review. See Hough v. Shakopee Pub. Schs., 608 F.Supp.2d. 1087, 1114 (D. Minn. 2009) ("[T]o say that a policy is unreasonable is very different from saying that the policy is irrational.").

Courts must be "mindful" that the educational context is a unique setting, requiring a careful review of the proper analysis for similarly situated persons and whether the high bar has been met under rational basis review. See Mathers v. Wright, 636 F.3d 396, 400 (8th Cir. 20111) (finding equal protection claim when plaintiff made sufficient contentions that the teacher acted with "irrational and arbitrary animus" when treating the disabled student differently than her peers).

Before delving into whether there was a rational basis for the conduct taking place in defendant Weisenburger's classroom, the proper framework for what constitutes 'similarly situated persons' must be analyzed. Plaintiffs contend the proper context is between these disabled children inside defendant Weisenburger's classroom alongside the rest of the student body who do not have disabilities. Only children with disabilities were members of defendant Weisenburger's classroom. Defendants, however, contend the plaintiffs should only be measured against one another inside defendant Weisenburger's classroom, and *not* against the rest of the student body.

The United States Court of Appeals for the Eighth Circuit has not fully analyzed what is the proper context for assessing equal protection claims among students with disabilities, namely should it be against solely those in their respective classrooms, or the student body writ large?  In Mathers v. Wright, 636 F.3d 396 (8th Cir. 2011), the Eighth Circuit found a properly pleaded equal protection claim (from a student with permanent or long-term impairments and educationally disabled) when comparing the treatment she endured against those non-disabled students in the *same classroom*.  636 F.3d 396, 400 (8th Cir. 2011) ("These students are similarly situated by virtue of being taught by Wright in the *same classroom*. It is [the student's] experience as a student as such, and not her status as a disabled student, that defines the ground of comparison on which her equal protection claim rests." (emphasis added)).  In an *unpublished* opinion, the Sixth Circuit has been more unequivocal in holding that "[g]eneral education and special education students are not similarly situated for the purposes of equal protection analysis." Clark v. Banks, 193 Fed.Appx. 510, 515 (6th Cir. 2006) (*unpublished*).  In Clark v. Banks, the Sixth Circuit approvingly quoted the District Court below in noting that "because school districts are obligated by federal and state mandate to provide special programs and services to disabled students, which often increase the cost of educating the student, [such disabled students] are not similarly situated to general education students."  Id. (internal quotations omitted) (alteration in original).

Instead of providing evidence of different treatment between disabled and non-disabled students at May Overby, plaintiffs cite to irrelevant case law concerning *racial* discrimination in a *higher education* setting, *not* the proper standard for ascertaining the proper similarly treated student framework.  Further, plaintiffs fail to offer evidence into the record of how students at May Overby who do not have disabilities are actually treated.  Plaintiffs make conclusory statements comparing the treatment sustained by A.A., B.B., and C.C., including different arrival and departure times, using different doors, different seating requirements at lunch, etc., but fail to provide any evidence of how non-disabled students are treated.  Without such evidence in the record, the Court cannot discern how these plaintiffs were treated differently from other students at May

Overby who do not have disabilities, assuming without deciding the entire student body would be the proper 'similarly treated students' for equal protection analysis. See, e.g., Philip v. Ford Motor Co., 413 F.3d 766, 768 (8th Cir. 2005) (holding on summary judgment, within employment discrimination context, the plaintiff "bears the burden to proffer 'specific, tangible evidence' that employees who were 'similarly situated in all respects' to him received different treatment") (*quoting* Rose-Maston v. NME Hosp., Inc., 133 F.3d 1104, 1109 n.4 (8th Cir. 1998) (first quote); Gimore v. AT&T, 319 F.3d 1042, 1046 (8th Cir. 2003) (second quote)). "'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient' to survive summary judgment." Anderson v. Durham D&M, LLC, 606 F.3d 513, 518 (8th Cir. 2010) (*quoting* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). Plaintiffs must go beyond merely assuming students without disabilities were treated differently and provide actual evidence.

Even if plaintiffs successfully pleaded that the minor plaintiffs should be assessed against May Overby's entire student population, they have not met their burden under rational basis review. Plaintiffs bear a high burden to show there was no rational basis for the alleged ways in which these students were treated differently by ASD than the rest of the student body at May Overby.

First, assuming only plaintiffs were required to arrive and leave at different times than their peers and through different doors, there may be rational explanations: perhaps these students needed more time to prepare for entering and departing school-grounds or required staff-assistance. Plaintiffs fail to show there is *no* rational basis for such treatment of this non-suspect class of individuals. Further, plaintiffs have not satisfied their high burden that there is no "rational relationship" between having students with disabilities sit at a particular table during lunch and "some legitimate governmental purpose." Heller v. Doe, 509 U.S. 312, 320 (1993). This may be done to supervise the students more easily with a limited staff, and thus perhaps satisfying a legitimate purpose for ASD. Similar rationale imperils plaintiffs' claim under rational basis review for providing different locations and times for the students' recess.

45

What is a closer call, however, are plaintiffs' claims of unconstitutionally dissimilar treatment pertaining to restraint and seclusion. While plaintiffs fail to brief how students without disabilities are disciplined, assuming only the minor plaintiffs fell victim to the seclusion room and in such extreme use, a rational relationship still exists between these procedures and a legitimate governmental purpose: ensuring an orderly and productive classroom. Defendant Weisenburger may have acted in a grossly negligent manner in subjecting these vulnerable children to such measures, but that does not mean she and ASD were *irrational*. Similar analysis bears a similar conclusion for the no-touch policies for A.A. and B.B.

Even assuming these students should be measured against the entire student body, and not solely amongst defendant Weisenburger's classroom, and assuming there was adequate evidence in the record of how non-disabled children were treated, plaintiffs still cannot meet their high burden under rational basis review for their equal protection claims. If *some* rational relationship can explain the disparate treatment to advance some legitimate governmental purpose – such as the orderly education and supervision of students with disabilities alongside students without disabilities – plaintiffs fail to meet their burden. See Walker v. Hartford Life & Accident Ins. Co., 831 F.3d 968, 976 (8th Cir. 2016) (explaining that "[u]nder federal rational-basis review, '[courts] will uphold the [action] so long as it bears a rational relation to some legitimate end.'") (*quoting* Romer v. Evans, 517 U.S. 620, 631 (1996)).

The Eighth Circuit found a successful equal protection claim against a school district for its treatment of a student with disabilities in Mathers v. Wright, 636 F.3d 396 (8th Cir. 2011). In Mathers, the plaintiff successfully pleaded an equal protection claim when the teacher "refus[ed] to teach [her], isolate[ed] her during recess and fire drills, and ma[de] her crawl on the floor." 636 F.3d 396, 400 (8th Cir. 2011). However, distinguishable from this case, the plaintiff was able to successfully plead animus on the part of the teacher against the student. Id. at 400–01. Here, plaintiffs fall short of pleading animus.

While defendant Weisenburger may have shown little respect for the students and acted far below the quality of teaching one would expect, incompetent discharge of her duties is not sufficient for an actionable equal protection claim. Because plaintiffs have not raised a genuine issue of material fact for whether the conduct of ASD and named defendants were rationally related to a legitimate government purpose, summary judgment should be granted against plaintiffs' equal protection claims.

### 8.  *Qualified Immunity*

Whether defendant Weisenburger must proceed further in defending plaintiffs' Fourth and Fourteenth Amendment claims rest on whether she is entitled to qualified immunity. Defendant posits (1) there was no constitutional violation, but even if there was it (2) was not clearly established to strip away her qualified immunity. Having already found there is a genuine issue of material fact on these two § 1983 claims brought by plaintiffs, the Court now examines whether defendant Weisenburger remains shielded under qualified immunity.

Qualified immunity is a doctrine that "shields a government official from liability unless his conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Franklin v. Peterson, 878 F.3d 631, 634–35 (8th Cir. 2017) (*quoting* Burns v. Eaton, 752 F.3d 1136, 1139 (8th Cir. 2014)).

In determining whether a defendant is entitled to qualified immunity this Court must determine whether "(1) the evidence, viewed in the light most favorable to the plaintiff, establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of violation." Rogers v. King, 885 F.3d 1118, 1121 (8th Cir. 2018). *See also* Raines v. Counseling Assocs., Inc., 883 F.3d 1071, 1074 (8th Cir. 2018), as corrected (Mar. 6, 2018). "To deny qualified immunity, the answer to both questions must be yes." Cravener v. Shuster, 885 F.3d 1135, 1138 (8th Cir. 2018). Either inquiry may be addressed first. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

The United States Court of Appeals for the Eighth Circuit has only rarely addressed qualified immunity within the school setting when dealing with disabled

47

students but has offered useful guidance.  In <u>Heidemann v. Rother</u>, 84 F.3d 1021 (8th Cir.
1996), the Eighth Circuit held that "when an authorized professional acting under color of
state law exercises professional judgment in treating a disabled individual under the
state's care, and that exercise of judgment would otherwise cause unconstitutional bodily
restraint, he or she is entitled to qualified immunity if such treatment is within the scope
of professionally acceptable choices, which, for purposes of judicial review, is broadly
defined to include any choice that is not a *substantial departure* from accepted
professional judgment, practice, or standards."  84 F.3d 1021, 1030 (8th Cir. 1996)
(emphasis in original).  <u>See also Clines v. Special Admin. Bd. Transitional Sch. Dist. of
the City of St. Louis</u>, 2020 WL 3036053 at *10 (E.D. Mo.) (*unpublished*) (holding on
Motion to Dismiss that defendant was not entitled to qualified immunity when defendant
"grabbed a[n almost entirely non-verbal] student by the foot and threw it upwards with
enough force to result in broken bones.").  In <u>Heidemann</u>, the Court did find the
defendants entitled to qualified immunity because one defendant, a licensed physical
therapist, produced an affidavit that the disputed blanket wrapping technique in question
was an "accepted practice in the field of pediatric physical therapy and occupational
therapy."  <u>Heidemann</u>, 84 F.3d at 1030 (internal quotations omitted).

In an *unpublished* opinion, the Fourth Circuit looked to <u>Heidemann</u> when holding
defendants were *not* entitled to qualified immunity when the appellees produced evidence
of appellants' "animus" towards the appellee through "early hostility towards [appellee],
their cruel and verbally abusive remarks to the child, and their comments suggesting that
they were conspiring to prevent . . . her getting educational services to which she might
otherwise have been entitled."  <u>H.H. v. Moffett</u>, 335 Fed.Appx. 306, 313 (4th Cir. 2009)
(*unpublished*).  These allegations were "all the more concerning given [appellee's]
limited ability to communicate verbally, meaning that she could neither report nor reject
the appellant's conduct."  <u>Id</u>.  Because of this substantial departure from the professional
standards expected of school officials, the Court noted that they "need not identify a case
that is factually on all-fours in order to find that a clearly established right has been
violated."  <u>Id.</u> at 314.  It instead "'must be sufficiently clear that a reasonable official

48

would understand that what he is doing violates that right.'" Id. (*quoting* Hope v. Pelzer, 536 U.S. 730, 739 (2002)).

Here, defendant Weisenburger is not entitled to qualified immunity due to her repeated and egregious substantial departure from the professional standards expected of her. First, the Court has already discussed why there may be a substantial departure from the care owed to plaintiffs by ASD, *supra*. Defendant Weisenburger's alleged conduct falls far from what can be considered within the ambit of professional standards when responsible for students with disabilities like A.A., B.B., and C.C. Unlike in Heidemann, defendants do not offer substantive evidence by professionals on how such inordinate use of the seclusion room, dragging children into pools, and other alleged conduct is within the professional standards expected of them. See Heidemann, 84 F.3d 1021, 1030–31 (8th Cir. 1996) (holding affidavit from licensed therapist shows the blanket-wrapping technique in question *is* within the professional standards for seeking to calm a child). At a minimum, genuine issues of material facts rule out qualified immunity.

Plaintiffs' evidence falls closer to the facts in H.H. than Heidemann. In H.H., the school officials were caught "gossiping, making fun of both [appellee] and other children in the school," going so far as to tell a severely disabled elementary-aged girl she is "gross," "coddled," and "has a face only a mother could love." H.H., 335 Fed.Appx. at 309 (internal quotations omitted). At May Overby, like in H.H., defendant Weisenburger was reported to "talk[] about the [disabled] children and putting them down, calling them names" and to gossip about the children to colleagues. Murphy transcript, Doc. 104-6 at 28; Weixel transcript, Doc. 104-9 at 28.[9] See also Weixel May 2015 letter, Doc. 114-2 at 1 (Ms. Weixel reporting that defendant Weisenburger, while laughing, told her "[o]h you are so cute talking to [the students] like they understand you."). While E.E.'s constitutional claims have been dismissed under the applicable statute of repose, the conduct defendant Weisenburger directed at E.E. is indicative of her callous indifference

---

[9] Ms. Murphy's transcript was filed under Doc. 104 in error. Her transcript was filed again, Doc. 113, under seal, perhaps incorrectly.

towards her students writ large and because it involved conduct in front of the other plaintiff students: she would gossip that E.E.'s parents were "drug users and losers," as well as check the student's underwear on a daily basis to report loudly enough for the class to hear that E.E. was wearing the same underwear as earlier.  Weixel transcript, Doc. 104-9 at 23–24.  While plaintiffs do not reach the high bar for a showing of animus, to posit there was no substantial departure from professional standards through repeated showings of callous indifference is a far step from reality.  Like H.H., defendant Weisenburger allegedly grossly substantially departed beyond what could plausibly be understood as within the professional standards required when caring for ASD's most vulnerable students.

Analogous to the students in Heidemann and H.H., A.A., B.B., and C.C. had limited verbal skills.  In all instances it was difficult for these students to cry out for help from parents about the treatment they endured at school and elsewhere.  For plaintiffs to prevail on a finding of no qualified immunity for defendant Weisenburger, the "clearly established" threshold "need not be a case decided on all fours with the present factual circumstances."  Wilson v. Lawrence Cty., 260 F.3d 946, 951 (8th Cir. 2001) (citing Vaughn v. Ruoff, 253 F.3d 1124, 1130 (8th Cir. 2001)).  Instead, "it need only be apparent from pre-existing law that the conduct is unlawful."  Id. (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987).  The Court finds it apparent that defendant Weisenburger allegedly substantially departed from her professional obligations in her treatment towards A.A., B.B., and C.C and is thus not entitled to qualified immunity.  And because the Court finds there is no supervisory liability for the other individually named defendants, their claim of qualified immunity is moot.

### G. Plaintiffs' ADA/Rehabilitation Act Claims

In addition to their claims under § 1983, plaintiffs have brought forward causes of action under the ADA and § 504 of the Rehabilitation Act ("§ 504").[10]  Defendants again

---

[10] Defendants rightly note that plaintiffs' Amended Complaint alleges that "all plaintiffs" are bringing forward claims under the ADA and § 504, opposed to just the minor plaintiffs who hold the requisite disability for cognizable claims.  See AMENDED COMPLAINT, Doc. 63 at 38–40.  The Court only assesses claims brought by the minor plaintiffs under the ADA and § 504.

assert that plaintiffs are barred from pleading these statutory claims due to their failure to exhaust administrative remedies under the IDEA, and, even if the claims are ripe, they hold no merit, and finally that there is not adequate causation under either statute.

### 1. *Pleading ADA/Rehabilitation Act Claims in School Context*

The ADA ensures that "'no qualified individual with a disability shall, by reason of such disability . . . be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" De Boise v. Taster Intern., Inc., 760 F.3d 892, 899 (8th Cir. 2014), *cert. denied*, 575 U.S. 1025 (2015) (*quoting* 42 U.S.C. § 12132). Similarly, the Rehabilitation Act "prohibits disability discrimination," but unlike the ADA it "applies only to recipients of federal funding." AP v. Anoka-Hennepin Indep. Sch. Dist. No. 11, 538 F.Supp.2d 1125, 1138 (D. Minn. 2008). Section 504 mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . " 29 U.S.C. § 794(a). The ADA and Rehabilitation Act operate similarly, including within the school context. See Layton v. Elder, 143 F.3d 469, 472 (8th Cir. 1998) ("The rights, procedures, and enforcement remedies under Title II [of the ADA] are the same as under section 504.") (*citing* Pottgen v. Missouri State High Sch. Activities Ass'n, 40 F.3d 926, 930 (8th Cir. 1994)). Except for the requisite level of causation, the Court assesses both the ADA and Section 504 claims together. In order for plaintiffs "[t]o prevail on an ADA claim . . . [they] must demonstrate "'that [they are] a qualified individual with a disability denied participation in, or the benefits of, the services, programs, or activities of a public entity because of [their] disability.'" De Boise, 760 F.3d at 899 (*quoting* Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998)).

Further, when the "alleged ADA and § 504 violations are based on educational services for disabled children, [plaintiffs] must prove that school officials acted in bad faith or with gross misjudgment." Richardson v. Omaha Sch. Dist., 957 F.3d 869, 876 (8th Cir. 2020) (internal quotations omitted). Here, defendants do not contest that the

plaintiffs are qualified individuals or that ASD is an applicable public institution.  Rather, the parties diverge on whether there are genuine issues of material fact on whether ASD demonstrated bad faith or gross misjudgment and whether there is sufficient causation. Each will be discussed in turn.

While defendants renew their assertion that the Court cannot hear plaintiffs' ADA and Section 504 claims due to plaintiffs' failure to exhaust their administrative remedies under the IDEA, they continue to be mistaken.  The gravamen of plaintiffs' claim is not a failure of adequate educational opportunities at ASD, but instead the allegations of abuse that occurred within the schoolhouse doors and elsewhere.  See MEMORANDUM & ORDER DENYING MOTION TO DISMISS, Doc. 49.  While the additional step of pleading bad faith or gross misjudgment is required for violations based on "educational services for disabled children," – and which both parties assert must be met in this case – this does not mean that the ADA and § 504 claim must revolve around plaintiffs' FAPE.  Instead, the Court assesses plaintiffs' ADA and § 504 claims within the educational service context, i.e., within the schoolhouse doors, which does not always require the exhaustion of administrative remedies.  Cf. M.Y. v. Special Sch. Dist. No. 1, 544 F.3d 885, 888–89 (8th Cir. 2008) (analyzing § 504 claims in school setting both for denial of FAPE and for failure to provide reasonable accommodation but applying gross misjudgment step to both separate theories).

To establish either bad faith or gross misjudgment, "'a plaintiff must show that the defendant's conduct departed substantially from accepted professional judgment, practice or standards so as to demonstrate the persons responsible actually did not base the decision on such a judgment.'"  Richardson v. Omaha Sch. Dist., 957 F.3d 869, 876 (8th Cir. 2020) (quoting B.M. v. S. Callaway R-II Sch. Dist., 732 F.3d 882, 887 (8th Cir. 2013)).  This requires "more than 'mere non-compliance with the applicable federal statutes.'"  Id. (quoting B.M., 732 F.3d at 887).  Instead, "[t]he non-compliance 'must deviate so substantially from accepted professional judgment, practice, or standards as to demonstrate that the defendant acted with wrongful intent.'"  Id. (quoting B.M., 732 F.3d at 887).  Because the Court has already decided that defendants allegedly substantially

52

departed from their accepted professional standards, *supra*, for A.A., B.B., and C.C., the Court now turns to whether the same is true for D.D. and E.E.

### 2. *ADA/Rehabilitation Act Claims for Minor Plaintiffs*

As a preliminary matter, the Court returns to its prior discussion of allegations relevant to all five minor plaintiffs. The Court reiterates that the Department of Education urges schools to not use restraint and seclusion lightly, but rather instructs school officials to use these practices only "where the child's behavior poses imminent danger of serious physical harm to self or others and other interventions are ineffective and should be discontinued as soon as imminent danger of serious physical harm to self or others has dissipated." U.S. DEP'T OF EDUC., Restraint and Seclusion: Resource Document 12 (2012) (available at https://www2.ed.gov/policy/seclusion/restraint-and-seclusion-resource-document.html). These meaures are "never [to] be used as punishment or discipline . . . [or] as a means of coercion or retaliation, or as a convenience." Id. To do so would be inconsistent with "the child's rights to be treated with dignity and to be free from abuse." Id. And to ensure these practices are used properly, "[p]olicies regarding the use of restraint and seclusion should be reviewed regularly and updated as appropriate." Id. As the Court has already noted, *supra*, ASD did not have a uniform policy on restraint and seclusion at the time of plaintiffs' allegations. OCR Report, Doc. 114-28.

The Court also acknowledges evidence concerning how the small windowless room was used for seclusion against all minor plaintiffs, except for D.D., as punishment or for convenience of the teacher. See Doc. 114-27 at 2, Exhibit 28. These students would be left in the seclusion room for an entire afternoon at a time, Weixel transcript, Doc. 104-9 at 52–53, despite defendant Kaul's own admission that children are to be restrained only as a last resort. Kaul transcript, Doc. 104-3 at 19. Instead of leaving the room when no longer a threat to themselves or others, these children could only leave when they finished assigned tasks irrelevant to concerns of being a danger. See Bellefeuille transcript, Doc. 104-1 at 26. And because defendant Kaul, the supervisor tasked with investigating allegations of improper restraint and seclusion, did not keep

substantive documentation of her purported investigations – a fact defendant Guffin acknowledges is problematic –, further evidence becomes difficult to ascertain. Kaul transcript, Doc. 104-3 at 131–32; Guffin transcript, Doc. 104-2 at 52.

D.D., a non-verbal student who has a rare genetic disorder which effects his development and inhibits his capacity to pursue common tasks like toileting, would be left out in the hallway – on his own – repeatedly by ASD staff when he would be "really loud and vocal." See Murphy transcript, Doc. 114-4 at 23, 25 (while left in the hallway, Murphy reported she was told staff could watch him from the classroom). Unlike his colleagues, D.D. was never taken to the seclusion room. Weixel transcript, Doc. 104-9 at 51–52. But like other students, Ms. Weixel reported that defendant Weisenburger would gossip about the children and their families in the classroom so that it would be obvious – even to the students like D.D. – who she was discussing. Id. at 25. While defendant Weisenburger would gossip in front of the children, she also directly told D.D. that he smelled and that he was disgusting, and that "even his spit was gross and it smelled." Id. at 63–64. D.D., who struggled with some basic bodily functions such as excess salivation, would not have his shirt wiped from the salivating until it got "really wet," and instead staff would let him sit in spittle. Id. at 73. And when it came to providing D.D. his milk, the staff would simply "tip his chin back and then have the cup tipped up and then they would tip both at the same time," leading to D.D. "chok[ing] on it a little bit, [l]ike some of [it] would . . . come back out sometimes." Id. at 74.

Janet Doe, D.D.'s mother, reported that D.D. would "routinely com[e] home with diapers that had not been changed. Sometimes the fecal matter was old and dried, other times his clothing would be soaked with urine." Janet Doe affidavit, Doc. 99 at 2.[11] When D.D. began forming a rash and sores around his mouth due to his salivating, Janet Doe asked defendant Weisenburger to use a soft towel for wiping salivation. Id. Defendant Weisenburger refused. Id. Like for A.A., B.B., and C.C., the Court finds D.D. has raised a genuine issue of material fact on whether there is gross misjudgment

---

[11] This document is currently filed under seal, perhaps because plaintiffs failed to properly remove all identification of one of the minor plaintiffs in this suit.

related to his ADA and § 504 claims, due to defendants' substantial departure from the
professional standards expected of teachers and supervisors when working alongside non-
verbal children with disabilities unable to speak out for help.

The Court now assesses whether E.E. also has an actionable claim for a gross
misjudgment on the part of defendants before turning to questions of adequate causation.

E.E. is the fifth and final student alleging ADA and § 504 claims. She has been
diagnosed with a moderate cognitive disability. While verbal, E.E.'s language skills are
limited, and she cannot communicate the experiences she has endured at school to her
mother, Julie Doe. Unlike D.D., E.E. was subject to the seclusion room. Bellefuille
transcript, Doc. 104-1 at 32. Incredulously, to control E.E.'s spontaneous getting up out
of her chair, defendant Weisenburger would – on numerous occasions – tie an exercise
belt around her stomach, tie it from behind her back and behind the chair, tie it tight
enough she "couldn't wiggle or anything." Weixel transcript, Doc. 104-9 at 47–48.
Understandably, E.E. would "freak out, for obvious reasons," and would "scream[] and
punch[], and she would even physically move her body to where the chair and the desk
would all move or get tipped over." Id. at 48. Straying far beyond the pale of acceptable
behavior, defendant Weisenburger would gossip that E.E.'s parents were "drug users and
losers," and would check the child's underwear on a daily basis and report to the class
that she was wearing the same underwear as earlier while telling E.E. that she was
"stinky." Id. at 23–24; Weixel May 2015 letter, Doc. 114-2 at 2. Like the four other
minor plaintiffs, the conduct E.E. endured, from the forceful tying of the belt to being
ridiculed in front of her class, could well be a substantial departure from the professional
standards defendants owed this child. The Court now turns to whether there is adequate
causation under the ADA and § 504.

### 3. *Causation Requirements for ADA and Rehabilitation Act*

While the ADA and § 504 pose interchangeable elements for actionable claims,
the causation required is slightly different. Under the ADA, the statute requires plaintiffs
to demonstrate they were denied "participation in, or the benefits of, the services,
programs, or activities of a public entity *because of* [their] disability. De Boise v. Taster

Intern., Inc., 760 F.3d 892, 899 (8th Cir. 2014), cert. denied, 575 U.S. 1025 (2015). Both parties cite to University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338 (2013)[12] for the proposition that plaintiffs must put forward a "but-for" relationship between the minor plaintiffs' disabilities and the resulting alleged harm. Section 504 requires a more stringent causation requirement: mandating that plaintiffs show defendants' acts were done "*solely* by reason of [their] disability." 29 U.S.C. § 794(a) (emphasis added).

The varying causation requirements make little difference in this matter because under either threshold plaintiffs have generated genuine issues of material fact on whether defendants acted "but-for" or "solely" due to plaintiffs' disabilities in the conduct they withstood. Only students with disabilities – many of whom are non-verbal while all are unable to ask parents for help – are alleged to be subjected to such extreme measures as being tied with belts or forced into pools against their will, among a myriad of other disturbing allegations in the record. Without their disabilities, these children would not have been placed in or subjected to the conduct alleged in defendant Weisenburger's classroom and elsewhere.

### 4. *Retaliation Claims for A.A. and B.B.*

A.A. and B.B. also bring forward retaliation claims pertaining to their parents filing an OCR complaint. ADA retaliation claims are analyzed under the burden-shifting framework presented in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Amir v. St. Louis Univ., 184 F.3d 1017, 1025 (8th Cir. 1999). Plaintiffs must make a prima facie case showing: "'(1) [they] engaged in statutorily protected activity; (2) [defendants] took an adverse action against [them]; and (3) . . . a causal connection [existed] between the adverse action and the protected activity.'" Canning v. Creighton Univ., 995 F.3d

---

[12] Nassar tackles the causation requirement for retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. See Univ. of Texas Sw. Med. Ctr. V. Nassar, 570 U.S. 338 (2013). Both parties follow Nassar for a but-for causation requirement under Title II of the ADA, not the lesser standard where the discrimination must only be a "motivating factor." This Court thus applies a "but-for" causation standard to the Title II claims. As the Court later explains, *infra*, Eighth Circuit precedent is clear that *retaliation* claims under the ADA require a "but-for" causation standard, while it is less clear whether the more stringent "but-for" causation requirement or "motivating factor" standard applies to the other ADA claims brought by plaintiffs.

603, 615 (8th Cir. 2021) (*quoting* Hustvet v. Allina Health Sys., 910 F.3d 399, 412 (8th Cir. 2018)) (third alteration in original). The causal connection is a "but-for" standard. Id. (*citing* Hustvet, 910 F.3d at 412); Oehmke v. Medtronic, Inc., 844 F.3d 748, 758 (8th Cir. 2016) (*citing* Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013)). If A.A. and B.B. can present a prima facie case, then defendants would bear the burden to produce a non-retaliatory reason for the actions to which the students were subjected. Canning, 995 F.3d at 615 (*citing* Hustvet, 910 F.3d at 412). If defendants can produce such a reason, plaintiffs then would "regain the burden of production to present evidence that the proffered reason was pretext for retaliation." Id. (*citing* Hustvet, 910 F.3d at 412).

Here, A.A. and B.B. fail to meet their burden under the McDonnell Douglas framework. Plaintiffs rest on conclusory allegations that they were retaliated against for engaging in a protected activity, seemingly being the OCR complaint. But A.A. fails not only to properly address (1) *what* the protected activity was – beyond stating so in a heading in her brief with no substantiation – but also meaningfully address the connection between the filing of the report and the reported incident. A.A. appears to state that because her parents filed an OCR complaint, defendants instituted a "no-touch" policy for A.A., which means nobody would change her urine-soaked clothing, and the causal connection is established because defendants reportedly told Jane Doe that to touch A.A. would be to violate her civil rights. See PLAINTIFFS' AMENDED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, Doc. 140 at 50–51. This becomes "very close" to retaliation. A.A. also alleges other instances of retaliation, but never meaningfully asserts a causal connection between specific acts of alleged harm towards her and the filing of any report, or even establishes a timeline between the reporting and transgressions. Without straying beyond conclusory statements, the Court finds A.A. failed to meet her burden to make a prima facie case of retaliation. Because plaintiffs' brief fails to even *mention* the supposed prima facie case for B.B., the Court also holds B.B. failed to meet his burden under the McDonnell Douglas framework. See, e.g., Quinn v. St. Louis Cty., 653 F.3d 745, 752 (holding

plaintiff failed to survive defendant's motion for summary judgment, when she "needed to explain the legal significance of her factual allegations beyond mere conclusory statements importing the appropriate terms of art," yet failed to do so).  Because A.A. and B.B. failed to substantively plead a retaliation claim, these two claims should be dismissed.

### 5. *Plaintiffs' Hostile Environment Claims*

Vexingly, even in a shorter space than their vague and conclusory retaliation claims, plaintiffs plead (without substantiating) hostile environment claims under the ADA and § 504.  See id. (holding without going beyond "mere conclusory statements," courts must dismiss plaintiffs' unsubstantiated claims on summary judgment).  Instead of offering the Court a semblance of analysis on a hostile environment claim, plaintiffs rest their unsubstantiated argument on the assertion "[t]here is no question that this case involves an abusive environment" in ASD's special education program, failing to provide even the elements for such a claim.  PLAINTIFFS AMENDED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, Doc. 140 at 150. "Just as a judge need not hunt for truffles in briefs, a judge need not hunt for legal authorities where a party has made no effort to present them."  Ceran v. Reisch, 2020 WL 6074189 at *2 (N.D. Iowa) (*unpublished*).  Due to plaintiffs failing to stray beyond conclusory allegations concerning their hostile environment claims, they should be dismissed.

The Court holds that plaintiffs' ADA and § 504 claims have put forward genuine issues of material fact, except for A.A. and B.B.s' retaliation claims and all minor plaintiffs' hostile environment claims.

### H.  Plaintiffs' South Dakota Human Rights Act Claims

In their Amended Complaint, plaintiffs brought forth claims on behalf of all plaintiffs against defendants under the South Dakota Human Rights Act ("SDHRA"). See AMENDED COMPLAINT, Doc. 63 at 41–42.  On summary judgment, plaintiffs now agree to dismiss their claims under the SDHRA.  PLAINTIFFS AMENDED MEMORANDUM

IN OPPOSITION TO DEFENDANTS MOTIONS FOR SUMMARY JUDGMENTS, Doc. 140 at 5, 53.
They should be dismissed.

## I.  Plaintiffs' Common Law Tort Claims

The final series of claims that plaintiffs bring forward are state common law
negligence claims under South Dakota law.  However, again, due to plaintiffs' failure to
properly plead the requisite elements for the claim at hand, the Court's final analysis is
brief.

Under South Dakota law, a negligence cause of action "'against a public entity . . .
requires [proof of] the existence of a duty, a breach of that duty, and causation.'"
Fodness v. City of Sioux Falls, 947 NW2d 619, 624 (S.D. 2020) (alterations in original)
(*quoting* Maher v. City of Box Elder, 925 NW2d 482, 485 (S.D. 2019)).  But under the
public duty doctrine, "'government entities are generally determined to owe
governmental duties only to the *public*, *not individuals*.  Id. (emphasis added) (*quoting*
McDowell v. Sapienza, 906 NW2d 399, 409 (S.D. 2018)).

There is an exception to the public duty rule where liability may be imposed
against local government actors when a "special duty" is owed the plaintiff.  The South
Dakota Supreme Court laid out its four-part test to determine the applicability of a special
duty owed by a governmental entity to a particular individual or set of individuals in
Tipton v. Town of Tabor, 538 NW2d 783 (S.D. 1995) ("Tipton I").  In Tipton I, the
South Dakota Supreme Court adopted Minnesota's Supreme Court's approach for
determining if there is an applicable special duty owed to a plaintiff or class of plaintiffs:

> (1) [T]he state's actual knowledge of the dangerous condition; (2)
> reasonable reliance by persons on the state's representations and conduct;
> (3) an ordinance or statute that sets forth mandatory acts clearly for the
> protection of a particular class of persons rather than the public as a whole;
> and (4) failure by the state to use due care to avoid increasing the risk of
> harm.

Tipton v. Town of Tabor, 538 NW2d 783, 787 (S.D. 1995) (*citing* Cracraft v. City of St.
Louis Park, 279 NW2d 801, 806–07 (Minn. 1979)).

Here, plaintiffs failed to plead the requisite elements for establishing a special duty
between the minor plaintiffs and ASD.  Instead of applying the proper test, plaintiffs

argue <u>Tipton I</u> does not even "examine the common law duty to protect an individual with whom the government agency has a 'special relationship.'"[13] PLAINTIFFS AMENDED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, Doc. 140 at 53. But <u>Tipton I</u> not only examines the relevant special relationship between government entities and classes of individuals, but it *announces the rule* for such an analysis under State law. See <u>Tipton I</u>, 538 NW at 787 (announcing special relationship elements under State Law); <u>Fodness v. City of Sioux Falls</u>, 947 NW2d 619, 626 (S.D. 2020) (reiterating and following <u>Tipton I</u>'s special duty analysis); <u>Maher v. City of Box Elder</u>, 925 NW2d 482, 485–86 (S.D. 2019) (same); <u>Walther v. KPKA Meadowlands Ltd. P'ship</u>, 581 NW2d 527, 532 (S.D. 1998) (same). Instead, plaintiffs point the Court to <u>Kirlin v. Halverson</u>, a case that examines special relationships for negligence claims in *private* circumstances, *not* public entities. See <u>Kirlin v. Halverson</u>, 758 NW 2d 436 (S.D. 2008) (analyzing negligence claim that arose between private parties in Sioux Falls mall and the applicability of a special duty that the transgressor's *private* employer owed plaintiff James Kirlin).

Because plaintiffs fail to properly plead the elements for a negligence claim against a governmental entity, defendants are granted summary judgment on plaintiff's state tort claims against ASD. However, plaintiffs *can* continue their negligence claims against defendant Weisenburger and other individuals at ASD, in their individual capacities, for any alleged assaults that they may have committed. And, because plaintiffs' other state claims do not withstand summary judgment, defendants' request that the Court dismiss plaintiffs' negligence claims under 28 U.S.C. § 1367(c)(3) is moot.

---

[13] While plaintiffs incorrectly state that <u>Tipton I</u> does not examine the very analysis it lays out for the elements to South Dakota's special relationship exception to the public duty rule, they cite to the wrong case, <u>Tipton II</u>, in making this assertion. See PLAINTIFFS AMENDED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, Doc. 140 at 53 ("Aberdeen Defendant erred in relying upon the decision in <u>Tipton v. Town of Tabor</u>, 567 NW2d 351, 357 (S.D. 1997) because <u>Tipton I</u> did not examine the common law duty to protect an individual with whom the government agency has a 'special relationship.'" Here, plaintiffs provide the Court with the citation to <u>Tipton II</u>, *not* <u>Tipton I</u>, despite referring to <u>Tipton I</u> which *does* lay out the proper test.

## III.   CONCLUSION

Defendants were charged with caring for some of Aberdeen's most vulnerable youths.  Instead of treating these children with "dignity" and providing them an education "free from abuse," they endured hundreds of visits to the small, windowless seclusion room, were allegedly stripped and forced into pools against their will, allowed to sit in urine-soaked clothing, be ridiculed and have underwear inspected before their peers, among a myriad of other tragic alleged instances of misconduct.  U.S. DEP'T OF EDUC., Restraint and Seclusion: Resource Document 12 (2012) (available at https://www2.ed.gov/policy/seclusion/restraint-and-seclusion-resource-document.html). These five children were unable to cry out for help.  Instead, their only "verbalization of the [alleged] abuse was [their] ability to scream out in pain." Hamilton v. Spriggle, 965 F.Supp.3d 560, 567 (M.D. Pa. 2013).  The minor plaintiffs were subjected to defendant Weisenburger's classroom day after day without respite, while ASD continued in its failure to instill a uniform restraint and seclusion policy for these students.  Only through the OCR complaint and the resulting investigation by federal agencies did May Overby and ASD put in place policies to ensure students like A.A. would not be subjected to the seclusion room over 270 times in a six-month timeframe.

The Court holds that D.D. and E.E.s' § 1983 claims are time-barred under the statute of repose, but that genuine issues of material fact remain on some of the § 1983 claims brought by A.A., B.B., and C.C.  A.A., B.B., and C.C.s' § 1983 claims cannot pierce ASD's immunity from suit under plaintiffs' theory of an unofficial agency custom, but *do* expose the school district to possible liability under a failure to train theory.  The Court does not find plaintiffs have established a genuine issue of material fact, however, for their claims against individually named defendants except for defendant Weisenburger.  Plaintiffs A.A., B.B., and C.C. have raised genuine issues of material fact for their Fourth Amendment and Fourteenth Amendment substantive due process claims. Plaintiffs fail to meet their burden on summary judgment for their parental due process claims under the Fourteenth Amendment, procedural due process claims under the Fourteenth Amendment, and equal protection claims under the Fourteenth

Amendment.  The Court also holds that defendant Weisenburger is not shielded by qualified immunity for A.A., B.B., and C.C.s' § 1983 claims.  Because the Court holds plaintiffs have pierced ASD's governmental immunity under a failure to train theory, ASD itself can also be found liable at trial for these three minor plaintiffs' Fourth Amendment and substantive due process Fourteenth Amendment claims as charged against defendant Weisenburger.

The Court also holds the statute of limitations for plaintiffs' ADA and § 504 claims should be tolled.  Because all five plaintiffs have raised genuine issues of material fact for their federal statutory claims, defendants' motion for summary judgment should be denied in respect to the ADA and § 504 claims for equal access to educational services.  However, because plaintiffs failed to properly plead A.A. and B.B.s' retaliation claims and all minor plaintiffs' hostile environment, those claims should be dismissed.

The Court should grant the parties' request to dismiss plaintiffs' claims under the SDHRA.

Finally, because plaintiffs failed to properly plead common law negligence claims under South Dakota law, summary judgment should be granted for ASD, but should not be granted for plaintiffs' claims against any individual defendants for alleged assaults against students.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, AS FOLLOWS:

1. Claims as to plaintiffs' SHRA claims are dismissed.

2. Claims of James Doe as a plaintiff are dismissed.

3. Defendants' motion for summary judgment is denied in part pertaining to defendant ASD's immunity from suit as a governmental agency for claims brought by plaintiffs A.A., Jane Doe, and John Doe.

4. Defendant Carrie Weisenburger's motion for summary judgment based upon qualified immunity for A.A., Jane Doe, and John Does' claims is denied.

5. A.A., Jane Doe, and John Does' duplicate claims against individually named defendants in their official capacity are dismissed.

62

6. Defendants' motion for summary judgment is granted in part pertaining to plaintiffs A.A., Jane Doe, and John Does' claims under the United States Constitution, via 42 U.S.C. § 1983, against defendants Becky Guffin, Camille Kaul, Renae Rausch, Colleen Murley, and Michael Neubert, and against defendant Weisenburger for theories of liability under parental due process under the Fourteenth Amendment, procedural due process under the Fourteenth Amendment, and equal protection claims under the Fourteenth Amendment.

7. Defendants' motion for summary judgment is denied in part pertaining to plaintiffs A.A., Jane Doe, and John Does' claims under the United States Constitution, via 42 U.S.C. § 1983, with theories of liability under the Fourth Amendment and substantive due process under the Fourteenth Amendment against defendant Weisenburger.

8. Defendants' motion for summary judgment is granted in part pertaining to plaintiff A.A.'s retaliation and hostile environment claims under the Americans with Disabilities Act and § 504 of the Rehabilitation Act.

9. Defendants' motion for summary judgment is denied in part pertaining to plaintiff A.A.'s claims under the Americans with Disabilities Act and § 504 of the Rehabilitation Act for equal access to educational services.

10. Defendants' motion for summary judgment is granted in part pertaining to plaintiff A.A., Jane Doe, and John Does' common law negligence claims under South Dakota law against ASD, but not as to individually named defendants alleged to have assaulted A.A.

11. Defendants' motions for summary judgment against plaintiffs B.B. and Jessica Doe, docs. 78 & 92, are granted in part and denied in part.

12. Defendants' motion for summary judgment is denied in part pertaining to defendant ASD's immunity from suit as a governmental agency for claims brought by plaintiffs B.B. and Jessica Doe.

13. Defendant Carrie Weisenburger's motion for summary judgment for claims brought B.B. and Jessica Doe based upon qualified immunity is denied.

14. B.B. and Jessica Does' duplicate claims against individually named defendants in their official capacities are dismissed.

15. Defendants' motion for summary judgment is granted in part pertaining to plaintiffs B.B. and Jessica Does' claims under the United States Constitution, via 42 U.S.C. § 1983 against defendants Guffin, Kaul, Rausch, Murley, and Neubert, as well as for defendant Weisenburger for theories of liability under parental due process under the Fourteenth Amendment, procedural due process under the Fourteenth Amendment, and equal protection claims under the Fourteenth Amendment.

16. Defendants' motion for summary judgment is denied in part pertaining to plaintiffs B.B. and Jessica Does' claims under the United States Constitution, via 42 U.S.C. § 1983, with theories of liability under the Fourth Amendment and substantive due process under the Fourteenth Amendment against defendant Weisenburger.

17. Defendants' motion for summary judgment is granted in part pertaining to plaintiff B.B.s' retaliation and hostile environment claims under the Americans with Disabilities Act and § 504 of the Rehabilitation Act.

18. Defendants' motion for summary judgment is denied in part pertaining to plaintiff B.B.'s claims under the Americans with Disabilities Act and § 504 of the Rehabilitation Act for equal access to educational services.

19. Defendants' motion for summary judgment is granted in part pertaining to plaintiff B.B. and Jessica Does' common law negligence claims under South Dakota law against ASD, but not as to individually named defendants alleged to have assaulted B.B.

20. Defendants' motions for summary judgment against plaintiffs C.C., Jill Doe, and Jeff Doe, docs. 81 & 92, are granted in part and denied in part.

21. Defendants' motion for summary judgment is denied in part pertaining to defendant ASD's immunity from suit as a governmental agency for claims brought by plaintiffs C.C., Jill Doe, and Jeff Doe.

22. Defendant Carrie Weisenburger's motion for summary judgment is denied. Qualified immunity does not apply to Weisenburger.

23. C.C., Jill Doe, and Jeff Does' duplicate claims against individually named defendants in their official capacity are dismissed.

24. Defendants' motion for summary judgment is granted in part pertaining to plaintiffs C.C., Jill Doe, and Jeff Does' claims under the United States Constitution, via 42 U.S.C. § 1983 against defendants Guffin, Kaul, Rausch, Murley, and Neubert, and for defendant Weisenburger for theories of liability under parental due process under the Fourteenth Amendment, procedural due process under the Fourteenth Amendment, and equal protection claims under the Fourteenth Amendment.

25. Defendants' motion for summary judgment is denied in part pertaining to plaintiffs C.C., Jill Doe, and Jeff Does' claims under the United States Constitution, via 42 U.S.C. § 1983, with theories of liability under the Fourth Amendment and substantive due process under the Fourteenth Amendment against defendant Weisenburger.

26. Defendants' motion for summary judgment is granted in part pertaining to plaintiff C.C.'s hostile environment claim under the Americans with Disabilities Act and § 504 of the Rehabilitation Act.

27. Defendants' motion for summary judgment is denied in part pertaining to C.C.'s claims under the Americans with Disabilities Act and § 504 of the Rehabilitation Act for equal access to educational services.

28. Defendants' motion for summary judgment is granted in part pertaining to plaintiff C.C., Jill Doe, and Jeff Does' common law negligence claims under South Dakota law against ASD, but not as to individually named defendants alleged to have assaulted C.C.

29. Defendants' motions for summary judgment against plaintiffs D.D. and Janet Doe, docs. 84 & 92, are granted in part and denied in part.

30. Defendants' motion for summary judgment is denied in part pertaining to defendant ASD's immunity from suit as a governmental agency for claims brought by plaintiffs D.D. and Janet Doe.

31. D.D. and Janet Does' duplicate claims against individually named defendants in their official capacity are dismissed.

32. Defendants' motion for summary judgment is granted in part pertaining to all of plaintiffs D.D. and Janet Does' claims under the United States Constitution, via 42 § U.S.C 1983.

33. Defendants' motion for summary judgment is granted in part pertaining to plaintiff D.D.'s hostile environment claim under the Americans with Disabilities Act and § 504 of the Rehabilitation Act.

34. Defendants' motion for summary judgment is denied in part pertaining to D.D.'s claims under the Americans with Disabilities Act and § 504 of the Rehabilitation Act for equal access to educational services.

35. Defendants' motion for summary judgment is granted in part pertaining to D.D. and Janet Does' common law negligence claims under South Dakota law against ASD, but not as to individually named defendants alleged to have assaulted D.D.

36. Defendants' motions for summary judgment against plaintiffs E.E. and Julie Doe, docs. 87 & 92, are granted in part and denied in part.

37. Defendants' motion for summary judgment is denied in part pertaining to defendant ASD's immunity from suit as a governmental agency for claims brought by plaintiffs E.E. and Julie Doe.

38. E.E. and Julie Does' duplicate claims against individually named defendants in their official capacity are dismissed.

39. Defendants' motion for summary judgment is granted in part pertaining to all of plaintiffs E.E. and Julie Does' claims under the United States Constitution, via 42 U.S.C. § 1983.

40. Defendants' motion for summary judgment is granted in part pertaining to plaintiff E.E.'s hostile environment claim under the Americans with Disabilities Act and § 504 of the Rehabilitation Act.

41. Defendants' motion for summary judgment is denied in part pertaining to E.E.'s claims under the Americans with Disabilities Act and § 504 of the Rehabilitation Act for equal access to educational services.

42. Defendants' motion for summary judgment is granted in part pertaining to E.E. and Julie Does' common law negligence claims under South Dakota law against ASD, but not as to individually named defendants alleged to have assaulted E.E.

DATED this _20th_ day of September, 2021.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge